639 So.2d 773 (1994)
Louella MAYO, Plaintiff-Appellant,
v.
NISSAN MOTOR CORPORATION IN U.S.A., Fisher Marine, and Red River Marine, Inc., Defendants-Appellants.
No. 93-852.
Court of Appeal of Louisiana, Third Circuit.
June 22, 1994.
*776 John Taylor Bennett, Marksville, Charles Shelby Norris, Jr., Monroe, for Lou Mayo.
Michael Thomas Pulaski, Keith W. McDaniel, New Orleans, for Nissan Motor Corp.
Renee Yvette Roy, Mansura, for Everette Mayo, Sr.
Howard N. Nugent, Jr., Alexandria, for Red River Marine.
William H. deLaunay, Jr., Alexandria, for Fischer Marine.
Before LABORDE, KNOLL, THIBODEAUX and COOKS, JJ., and CULPEPPER[*], J. Pro Tem.
KNOLL, Judge.
This is a maritime tort suit. Plaintiff, Louella Mayo, sustained personal injuries while a passenger in the "Fisher Marine" aluminum "john" boat owned by her and her husband, Everette Mayo, and operated by her husband, when the boat struck a tree in the Ouachita River. Plaintiff filed suit in state court under the "savings to suitors" clause, naming several defendants, including Fisher Marine, Nissan Industrial Equipment Company, and Red River Marine. The Fisher Marine boat was console-steered and powered by a 40 horsepower motor when Mayo bought it in 1976 or 1977, but it was rated for a 55 horsepower motor. During 1989 Mayo removed the console and converted the boat to a tiller-steered boat. This reconfiguration of the boat reduced the motor rating to 30 to 35 horsepower. However, Red River Marine sold and installed on the boat a 55 horsepower tiller-steered Nissan motor. Plaintiff's theory of recovery, in part, was that the boat was overpowered by the 55 horsepower motor, which caused the boat/motor to go out of control. Fisher Marine filed a third-party demand against Everette Mayo and his insurer, and Nissan and Red River Marine filed third-party demands against Everette and Louella Mayo.
The third-party demands against Mayo's insurer were dismissed by summary judgment. The trial court overruled a peremptory exception to maritime jurisdiction prior to trial, and we denied a writ on the issue[1]. Fisher Marine ultimately settled with plaintiff. A bench trial was held as to the claims against Nissan and Red River Marine and the third-party demands. The court found that the "overpowered" boat/motor combination was a cause of the accident and found Nissan, Red River Marine, and Fisher Marine each 11% at fault. The court also found Everette Mayo 67% at fault. The court fixed Louella Mayo's damages at $838,993. The court held that Nissan and Red River Marine were not solidarily liable for Louella Mayo's damages, but held Nissan and Red River Marine each responsible for their virile share of 11%, or $92,289.23 plus interest from the date of judicial demand. Having found Nissan and Red River Marine liable only for their virile shares, the court dismissed their third-party demands against Everette Mayo. The court also dismissed the third-party demands against Louella Mayo. The parties appeal as follows.

LOUELLA MAYO'S APPEAL
Louella Mayo contends: 1.) the trial court erred in failing to apply general maritime law to the issue of solidarity to cast each defendant liable, in solido, for the entire amount of the judgment; 2.) in the alternative, if Louisiana law applies, the court erred in failing to cast Nissan in judgment for 50% of the damages under LSA-C.C. art. 2324; 3.) the trial court erred in reducing Louella Mayo's recovery by the fault attributable to Everette Mayo; 4.) the trial court erred in awarding interest only from the date of judicial demand and not from the date of the accident; and, 5.) the trial court erred in failing to find that Red River Marine was the agent of Nissan and in failing to hold Nissan liable for the fault of Red River Marine.

*777 EVERETTE MAYO'S APPEAL
Although Everette Mayo was not cast in judgment, he appeals the apportionment of fault to him in light of Louella's appeal on the issue of solidary liability.
Red River Marine filed a motion in our court asking that Everette Mayo's appeal be dismissed. Red River Marine points out that Everette Mayo only appears in this law suit as a third-party defendant to claims filed by third-party plaintiffs, Nissan and Red River Marine. Accordingly, it argues that he lacks standing to appeal since the third-party demands were dismissed and he was not cast in judgment in his wife's main demand against Nissan and Red River Marine.
We referred Red River Marine's dismissal motion to the merits and for reasons assigned infra, we dismiss Everette Mayo's appeal.

NISSAN'S APPEAL
Nissan contends: 1.) the trial court erred in assigning any fault to Nissan because the accident was caused solely by Everette Mayo's negligence; 2.) the trial court was clearly erroneous in finding that Nissan breached a duty to warn; and 3.) the general damage award of $600,000 is excessive and should be reduced.

RED RIVER MARINE'S APPEAL
Red River Marine contends: 1.) the trial court erred when it recognized as a source of duty Red River Marine's alleged position as a seller; 2.) the trial court erred when it held that Red River Marine had breached a duty of care as per their installation of the Nissan motor; and, 3.) the trial court erred in not finding the negligent operation and ownership of the boat by Everette Mayo to be the sole cause of Louella Mayo's injuries.

TRIAL COURT'S REASONS FOR JUDGMENT
We quote in part the trial court's excellent reasons for judgment.
"In 1976 or 1977 Rev. Everette Mayo, Sr., purchased a 15 and ½ foot Fisher Marine flat bottomed `John' boat. The boat was a console steered boat with pedestal seats and was powered by a 40 horsepower motor. During 1987, the 40 horsepower motor became inoperable and was unable to be repaired. Thereafter, Rev. Mayo decided to purchase another motor for his boat. The boat's rating plate authorized the use of a 55 horsepower motor. It was Rev. Mayo's intention to purchase such a motor. He shopped the various boating and marine supply stores from Jonesville to Alexandria. He located a 55 horsepower motor at Red River Marine, Inc. in Pineville, Louisiana. The motor he decided on was a 55 horsepower motor manufactured in Japan by Tohatusu and marketed in the United States under the Nissan named brand by Nissan Industrial Equipment Co. (hereafter referred to as `Nissan'.) Rev. Mayo eventually purchased the motor on January 12, 1989, and on that date Red River Marine installed it on his boat.
"Prior to having the motor installed on his boat Rev. Mayo made significant modifications to the vessel. He removed the two fixed pedestal seats and the steering console. He added plywood flooring and modified the seats so that they would be movable and not attached to the vessel in any manner. When the motor was added to the boat it became a tiller-steered outboard motor boat. As a result of such modification, the boat's horsepower rating was reduced from 55 horsepower to 30 or 35 horsepower.
"After purchasing the motor and having it installed on his boat, Rev. Mayo refused an offer from Red River Marine employees to test the boat on nearby Buhlow Lake. Subsequently, Rev. Mayo changed his mind after leaving Red River Marine with his boat in tow and decided to try the motor on the lake. With the help of his two sons he put his boat in and drove it around the lake for a short while. At this time he noticed the boat pulled to the right.
"A week later, on January 19th, Rev. Mayo's son, Kirk Mayo, (hereinafter referred to as Kirk) was involved in an accident while operating the boat. Later that year, in May, another of Rev. Mayo's sons, Tony Mayo, was involved in an accident while operating the boat. And on July 15, 1989, Rev. Mayo and his wife, Louella, together with two *778 friends, Rev. and Mrs. Bingham, were involved in yet another accident while Rev. Mayo was operating the boat. From the time Rev. Mayo purchased the boat until the last accident on July 15, 1989, he made at least two trips back to Red River Marine in Pineville. On these occasions he did not bring the boat back for an inspection or repairs. However, Rev. Mayo did complain about the problems he was having with the boat to the employees of Red River Marine.

* * *

"LOUELLA MAYO'S ACCIDENT
"Mrs. Mayo's theory of recovery is based on the fact that when the accident occurred, the boat was making a gradual or sweeping turn in the Ouachita River. While making that turn, the boat turned hard to the right, an event caused by `catching a chine', thereby causing momentary loss of control of the boat sending it crashing into a tree. She surmises the over-powering of the boat caused the `chine trip', and the subsequent accident.
"Robert Taylor, a defense witness with expertise in the field of naval architecture, marine engineering and accident reconstruction, testified at length regarding tests he performed with the Mayo boat as well as an exemplar boat. He testifies that `catching a chine' is a `memorable event'. The occupants of the boat would be thrown to the left and the boat would make a significant change in direction. He thereafter disputes the Mayo boat "caught a" chine prior to impact. He bases this on the testimony of Rev. and Mrs. Bingham, and the fact that he was unable to duplicate the event in either the Mayo boat or the exemplar boat.
"Commander Deck did, however, `catch a chine' in the Mayo boat with the 55 horsepower motor attached. (Albeit it was accomplished on the Mississippi River the day before the trial began.) While it was conspicuous by it's late forthcoming, the `chine trip' theory does explain the events which Rev. Mayo testified occurred immediately prior to impact with the partially submerged tree.
"Rev. Mayo testified as follows:
"`BENNETT: If you could show the Judge where you were coming from and as you're drawing that show him your path.
"E. MAYO: Okay. Judge, I'll call it cutting corners. I don't what [sic] anybody elsebut the contour of the river when I was coming south I came to this side. I came around that corner. I straightened up and I come across to this side coming into this corner. And this is not to ... (inaudible) ... and when I started around this bend and as I started to make my bend and I pushed out on this handle to make my turn, whateverwhatever happened to this boatto me the boat did a slip and from that point on I could not bring this motor back and it went into this turn and I thought I can't turn it loose because I'll flip the boat and when I thought that I was into the tree and then I hit aI hit a tree about that big just almost dead center, not quite. So I would say that at this point on theon the river that I probably wasn't twenty feet away from thebecause the water was so high. There wasn't any obstruction there and I knew the river. I had been there before. Been on the river lots of times. There wasn't any obstruction. So, I was twenty foot here probably when I lost it and went in that curve, I probably was thirty or forty feet away, maybe a little farther whenmaybe thirty. Thirty or forty feet would probably be the distance. So when I lost it when I come around here and I went to make my turn to go down the river when I lost the boat and I could not recover, it just went right injust made a turn and went right straight into the there.' (Rev. Mayo's testimony, pages 32-33.)
"Rev. Mayo further testified:
"BENNETT: Could you describe the turn that the boat made immediately before you went into the trees?
"E. MAYO: When I was travelling and I come to that curve and I wascertainly I had to go out a little bit, the boat had to go straight ahead so that I could makenegotiate my turn. So when I hit that point and I startedI moved the handle out to make my right hand turn, it felt to me like the boat slipped at that point and when it *779 did the motor went over and when it did I had the throttle open and the pressure was on me trying to get it back. I couldn't turn the throttle loose and I seen I was headed for the timber and I thought, my God, I can't turn loose I'll flip the boat over and when I thought that I was in the timber. I didn't have a chance to say anything, holler anything or do anything.
"BENNETT: You heard me ask Rev. Bingham what type turn this was, a gentle turn or a hard turn. What type turn was it to the best of your recollection?
"E. MAYO: My best recollection handling the boat and everything that I almost went into a ninetyalmost, not quite a ninety degree turn. (Rev. Mayo's testimony, pages 35-36.)
"It was Rev. Mayo's habit to `cut the corners' as he navigated the Ouachita. When the river made an `S' turn, he would take the boat near the inside bank at the top of the `S'; then cross the channel as he went through the middle of the `S'; and then take the boat near the outside bank of the river at the bottom of the `S'. To complete the maneuver, he would steer the boat along the outside bank until he was heading in the direction of the river. At the time of the accident, he was completing the last part of the maneuver, that is, he was steering the boat in a right-hand turn to align it with the course of the river. It was at this point when he was 20 to 40 feet from the partially submerged tree line (due to a 13 and ½ foot high water) that he `caught a chine' which caused the boat to enter into a severe right-hand turn. Due to the closeness of the boat to the bank, it struck the tree almost immediately. At ¾ throttle the boat would travel approximately 31 miles per hour. (See Mr. Taylor's testimony for procedure used to determine the boat's speed which this Court finds is a more precise way to measure speed than that of Commander Deck.) At that speed, the boat was travelling about 45 feet per second. (One travels 88 feet per second at 60 miles per hour.) Even if the boat's speed would have been reduced from the point of the `chine trip' until impact, it is doubtful if even a full second transpired over the entire event. The Binghams, being in the front of the boat would have experienced some movement (swaying) to the left but it occurred so close in time to the impact it is understandable they are unable to recount it. The movement they felt could not have approximated that of the Mayo's [sic] who were seated in the rear of the boat.
"Rev. Mayo was seated at the right rear of the boat operating the tiller. He was ejected from the boat over the left side. He traversed the entire width of the boat and cleared the twenty (20) inch side. Mrs. Mayo, seated in front of him was not ejected, but was thrown against the inside of the boat with such force that she suffered serious injuries.
"On the other hand, the Binghams were not thrown to the left, but were thrown in a more forward direction with Rev. Bingham's legs striking the front of the boat causing him significant pain. Likewise, Mrs. Bingham was thrown in a forward direction.
"While the occupant kinetics of the accident may be consistent with impact with a stationary object in a gradual right-hand turn, surely the occupant kinetics would be magnified and even more consistent with striking an object in a severe right-hand turn.
"It does not seem likely Rev. Mayo who has navigated the Ouachita River for many years lost his perspective. Quite the contrary, it would follow if one `cuts corners' in a turn he would be more alert when bringing his vessel close to the bank. Nor does it seem likely, Rev. Mayo was unable to see. He testified of no impairment to his vision. It is more probable than not, as the Mayo boat entered the choppy, swirling water near the bank at the bottom of the `S' curve, it `caught a chine', and immediately impacted the tree.

"CAUSE OF LOUELLA MAYO'S ACCIDENT
"As with many accidents, several acts contributed to the instant one. First, it can be said the accident would not have occurred had the boat been navigated in the channel of the river. Rev. Mayo's practice of `cutting the corners' placed the boat within 20 to 40 *780 feet of the trees. That reduced the margin of safety at speeds in excess of 30 miles per hour to a second or less. Had Rev. Mayo been in the channel of the river, he would have had adequate time to react to the `chine trip' and recover control of his vessel. As such, operating the boat at the close distance of the banks was a cause in fact of the accident.
"When travelling close to a submerged tree lined bank, the boat should be operated at a safe speed. Speeds in excess of 30 miles per hour within 20 to 40 feet from the bank is excessive and as such is a cause in fact of this accident.
"The trimming tab of the motor was not in proper align. Commander Deck testified it is the responsibility of the operator to maintain the trimming tab in proper align. The trimming tab is a device located on the rear of the motor below the decavitation plate and above the propeller blades. It is used to correct any natural deviation when the boat deviates to one side, right or left, from a straight course during sailing. It was in the same position at the time of the accident as it was when the motor was purchased and installed.
"Rev. Mayo refused to allow Red River Marine employees to test the boat with him at the time of the purchase. He did, however, test the boat in Buhlow Lake the day he bought the motor. At that time, he noticed the boat pulled to the right. According to the Motor's Operating Manual (page 12) he received when he purchased the motor, the adjustment of the trimming tab is a simple procedure. Rev. Mayo did not review the operating manual nor did he ever attempt to adjust the trimming tab.
"Rev. Mayo did, however, return to Red River Marine on at least two occasions after he purchased the motor and before the Louella Mayo accident on July 15, 1989. On one of those occasions he even complained about the boat, but sought no help in correcting this problem. He knew his boat pulled right, yet he took no steps to make any adjustment.
"The fact that the boat pulled to the right contributed to the `chine trip', and was a cause in fact of the accident. The reason the boat pulled right was because the trimming tab was out of align, and the responsibility to keep the trimming tab in proper align was that of Rev. Mayo.
"Commander Deck testified the tilt setting of the Mayo boat was not in proper align and, as a result, the motor may pitch left and cause the boat to turn right. The automatic trim had gone out on the Mayo boat, and due to the motor's configuration, the manual tilt could not be operated fully. On the other hand, Mr. Taylor testified the trim (the result of the motor's tilt was) on the Mayo boat was proper (2 to 6 degrees).
"Whether the tilt was in proper align or not cannot be attributed to anyone but Rev. Mayo. Commander Deck testified the proper tilt is the responsibility of the operator. Tilt adjustment is also set forth in the Operating Manual which Rev. Mayo did not review. Further, Rev. Mayo did not request any help or ask for any repairs from Red River Marine during his trips to the dealership despite the problems he was having with the boat.
"Finally, it is the opinion of the Court that the over-powered boat/motor combination contributed to the cause of the accident. When considering the evidence in its entirety, one can not escape that conclusion. The considerable difference in the power of a 30-35 horsepower motor and the 55 horsepower Nissan certainly magnified the already existing problems on the Mayo boat as well as its operator error. The significant difference in the speed (6-8 miles per hour depending on whether one would rely on Commander Deck's or Mr. Taylor's testimony) was also a contributing factor. For those reasons, the over-powering of the boat by the motor is a proximate cause or cause in fact of the accident. See Charpentier v. St. Martin Parish School Board [411 So.2d 717 (3rd Cir.1982)] Supra; Lear v. U.S. Fire Ins. Co., 392 So.2d 786 (3rd Cir.1980); Ganey v. Beatty [391 So.2d 545 (3rd Cir.1980)] Supra.
"There is a responsibility or duty to inform or warn the boating public of the proper boat/motor combination. This duty is not abrogated when a boat owner modifies his boat. Clearly, boat owners may (and many do) make changes in their boats' configuration *781 over the life of the boat. In this case, Rev. Mayo made massive changes in his twelve year old boat.
"It is just as clear many boat owners will change the motor on their aging boats as did Rev. Mayo. It is not common knowledge in the boating public that when one reconfigures a boat and then adds or changes a motor that the maximum motor size recommended may change. When the boat/motor configuration changes, the chances of having an accident increase. It is noted only a small percent of accidents are caused by over-powering (½%), but clearly some accidents are attributable to that factor.
"Fisher Marine informs the public of the maximum horsepower rating a boat may carry by placing a plate on the boat's transom giving that information. That is not sufficient to inform the boating public of the motor rating should the boat be reconfigured. Certainly, Fisher Marine cannot anticipate every configuration that can be made, but it should anticipate reconfiguration. A simple notice saying `motor rating may change if boat is reconfigured or modified' or some similar language would suffice. That information would put the public on notice when purchasing a new motor for a reconfigured boat to consider the effect of reconfiguration on the motor rating. Such a `warning' is inexpensive as it could simply be added to the existing information on the attached plate.
"The failure of Fisher Marine to provide such information or warning is a breach of the duty to inform or warn. As such, it was a contributing factor to the over-powering of the Mayo boat and a cause in fact of the accident.
"As the Court has stated, it is widely known that some boat owners will reconfigure their boats over the life of their boats. It is known that reconfiguring a boat may change the boat's motor rating. In that regard, when installing a motor which was once proper may result in over-powering. It is the responsibility or duty of the motor manufacturer to inform or warn the motor dealer of the possibility of over-powering a reconfigured boat by installing a motor which was once proper. In the motor's operating manual, some detail is given as to how to install the motor including several `notes' in heavy black print. No mention is made of the possibility of over-powering.
"Much ado was made regarding proper training of the dealer and his personnel in the installation of boat motors. But this is a simple matter and a single, simple notice would suffice. All the dealer needs to be aware of is the potential of over-powering when selling and installing a motor on a reconfigured boat. It cannot be said that giving such notice is extensive training (if it can be classified as training at all). A single notice or warning in the installation instructions would prevent over-powering as occurred in the instant case.
"The failure of Nissan to provide that simple installation information or warning to its dealers is a breach of their duty to inform or warn. As such, it is a contributing factor to the over-powering of the Mayo boat and a cause in fact of the accident.
"Red River Marine also owes a duty or responsibility to the boating public to refrain from installing over-powered motors on reconfigured boats. This duty comes not only from the fact that it sells motors, but also because it installs them. When a motor is installed on a boat which it knows to be reconfigured, (as it did in this case) its responsibility is to insure the boat can be operated safely once the motor is installed. To insure the boater's safety, over-powering must be considered. Once again, it is a relatively simple concept at work here. If a boat is reconfigured, the transom plate may provide for an over-powered motor. It is the dealer/installer's responsibility or duty to properly install a proper motor. Installing an over-powered motor is a case of improper installation of the motor. The failure to properly install the motor is a violation of the duty Red River Marine owed Rev. Mayo as the dealer and installer of the motor. It is, therefore, a contributing factor to the over-powering of the Mayo boat and cause in fact of the accident.
"Rev. Mayo, Fisher Marine, Nissan and Red River Marine all have legal responsibility *782 in causing the accident which injured Louella Mayo.
"In determining fault, the trial court as the finder of fact must consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damage claimed. In assessing the nature of the conduct of the parties, the court may consider various factors in determining the degree of fault assigned. Those factors include: (1) whether the conduct resulted from inadvertence or involved an awareness of danger; (2) how great the risk created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacity of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Walton v. Bellard, 581 So.2d 307, 312 (1st Cir.1991); Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2d 967, 974 (La.1985).
"Rev. Mayo bears the largest amount of fault or responsibility in causing the accident, and his fault is set at 67%. The remaining parties must share equally in the remaining 33% of the fault or 11% each for Fisher Marine, Nissan and Red River Marine.
"This Court is of the opinion comparative fault is a defense available to the corporate defendants. If a person suffers an injury as a result of the fault of more than one person the amount of damages shall be a joint, divisible obligation. A joint tortfeasor shall not be solidarily liable with any other person for damages attributable to the fault of such other person. (La.C.C. Art. 2324) Such is the law of the State of Louisiana and petitioners shall be bound by it.
"Comparative fault has been properly applied to products liability cases. Nicholas v. Homelite Corp., 780 F.2d 115D [1150] (5th Cir.1986); Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988); McCaskill v. Welch, 463 So.2d 942 (3rd Cir.1985); Bell v. Jet Wheel Blast, 462 So.2d 166 (La.1985).
"This Court can find no prohibition from extending comparative fault to admiralty cases in state courts. It has been held as a basis for applying comparative fault in products liability cases that the threat of reduction of recovery will provide consumers with an incentive to use products carefully and in a safe manner without exacting in inordinate sacrifice of other interests. McCaskill v. Welch, Supra. The same may be said of admiralty and maritime cases. This Court shall be persuaded by the general consideration of fairness and efficiency of apportioning fault not only in product liability cases but also admiralty and maritime suits. It also should be noted that Louisiana jurisprudence allows for reduction of one spouse's recovery by the comparative fault of the other spouse. Brown v. DOTD, 572 So.2d 1058 (5th Cir.1990); Bienvenu v. State Farm Mutual Automobile Ins., Co., 545 So.2d 581 (5th Cir.1989). Fault shall be allocated to all in proportion to their negligence. In that regard each corporate defendant shall be liable for only the joint, divisible obligation of 11% of the total recovery.

"DAMAGES
"At the time of her accident, Mrs. Mayo was a very active, independent 55 year old woman. She had been employed in the Catahoula Parish Sheriff's Office from 1978 through 1987, when she quit work to take some time off. In June, 1989, she began working for the Clerk of Court of Catahoula Parish, Louisiana. She has continued to be employed by the Clerk of Court as a part-time employee since the accident. Mrs. Mayo enjoyed visiting her friends, long shopping trips and travelling both with her husband as well as alone to work on her hobby genealogy. Since the accident such endeavors have been greatly restricted.
"Immediately after the accident, Mrs. Mayo began suffering pain. She was removed from the boat on raft and taken to Riverland Hospital in Ferriday, Louisiana. After she was x-rayed and stabilized she was transported to Jefferson Davis Hospital in Natchez, Mississippi. There she was treated by Dr. Carl Passman and it was determined she had a fracture of the spine at T-12 and ruptured discs at L-4-5. She also had other cuts and bruises.
"She was fitted for a body brace which she wore for approximately eight months. In *783 addition, she contracted a staph infection in the wounds of her left foot.
"She continued in the care of Dr. Passman for several months. He recommended surgery to fuse the fractured vertebra with a bone from her hip which was performed by Dr. Lawrence Dresup [sic] at Rapides General Hospital in Alexandria, Louisiana. She spent two (2) months in complete bed rest following the surgery followed by extensive physical therapy for six (6) weeks.
"She suffered significant back pain eventually being admitted to the emergency room at LaSalle General Hospital for the problem in August of 1990. She submitted to an MRI later in the year and surgery by Dr. Christopher Rich on December 4th and 10th of 1990. The surgical procedures were lengthy and complicated, requiring removal of a rib and a bone from her hip to repair the damaged area of her spine.
"She was in critical condition in the Intensive Care Unit for approximately ten (10) days. She remained in the hospital until December 24, 1990, when she was released at her request. Mrs. Mayo was in a body brace for eight (8) months following the December, 1990, surgery. She has submitted to further extensive physical therapy and continues to see Dr. Rich. She suffered significant pain for many months, and at the date of the trial was still taking medication for pain that `won't go away'.
"She has spent at least forty (40) days in hospitals, four (4) months in bed, and sixteen (16) months in body casts and braces. She has eight (8) surgical scars on her body including a fifteen (15) inch scar on her chest and a ten (10) inch scar on her back. While she continues to work part-time (she has a cot at work so she can rest), she no longer enjoys visiting her friends, playing with her grandchildren, shopping trips or travel. She can do very little housework and no yard-work.
"Mrs. Mayo's past medical bills are fixed at $92,286.00. She will undoubtedly require further medical treatment including medication and psychiatric treatment and, as such, the sum of $25,000.00 is awarded for those expenses.
"At the time of the accident Mrs. Mayo had a work life expectancy of 7.24 years (see P-24 and Nissan -22). She had no intention to work full-time when she returned to part-time work with the Clerk of Court. She was earning approximately $600.00 per month at the time of the accident. She planned to do abstract work in the Clerk's office, but there was no evidence as to what she would earn in that capacity. She did, however, have the proven capacity to earn in excess of $18,000.00 per year as a Civil Deputy Sheriff. On considering all the evidence and for the purpose of establishing her economic loss, the Court establishes her loss of earnings at $1,000.00 per month. Since Mrs. Mayo's work life expectancy from the date of the accident is only 4.46 years, and on taking notice that the current interest rate is so low, the Court will apply a discount rate of 4%. Therefore, her loss of earnings at the date of the trial is fixed at $33,500.00 (July 15, 1989 to April 27, 1992, or approximately 33.5 months - 33.5 × $1,000.00), and her future loss of earnings is fixed at $48,943.00 (4.46 years × $1,000.00 per month discounted by 4%).
"Mrs. Mayo has also suffered economic loss as a result of her inability to care for herself, her family, and her home. This loss shall continue past her work life until the age when the normal aging process would restrict her from performing those functions. That age shall be fixed at 72. Her disability will require that someone clean her home, help with food preparation and do some necessary yardwork in addition to the assistance given her in that capacity by her husband. The Court fixes the monthly cost of such services at $250.00. Therefore, the economic loss of her inability to perform household functions is fixed at $8,375.00 at the time of the trial ($250.00 per month × 33.5 months). The future loss of her inability to perform household functions is fixed at $30,889.00. (From the date of the trial Mrs. Mayo would live 13 years 3 months and 15 days (159.5 months) until her 72nd birthday. 159.5 months × $250.00 per month discounted at 4%.)
"For the considerable pain and suffering, both past and future and mental and physical, *784 as well as for the loss of enjoyment of life, Mrs. Mayo is awarded $600,000.00 in general damages.
"For the reasons set forth above the total damages of Louella Mayo are $839,993.00 together with legal interest from the date of judicial demand and for all costs of these proceedings to include expert witness fees. The total award to Mrs. Mayo from each defendant shall be $92,289.00 plus judicial interest."

APPLICABLE LAW
Even though this maritime tort case was brought in state court, reference to admiralty law is necessary to determine the rights and liabilities of the parties. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). In Green v. Industrial Helicopters, Inc., 593 So.2d 634, 637 (La.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 65, 121 L.Ed.2d 32 (1992), the Louisiana Supreme Court explained:
"As a general proposition, `[a] maritime claim brought in the common law state courts ... is governed by the same principles as govern actions brought in admiralty, i.e., by federal maritime law.' Powell v. Offshore Navigation, Inc., 644 F.2d 1063, 1065 n. 5 (5th Cir.1981). See also T. Schoenbaum, Admiralty and Maritime Law § 4-1 at 123 (1987) [hereafter, Schoenbaum]. Since the general maritime law is not a `complete or all inclusive system,' a federal court may adopt state statutory law and common law principles as the federal admiralty rule. Schoenbaum, supra, § 4-1 at 123. State law and regulations may also supplement federal maritime law when `there is no conflict between the two systems of law, and the need for uniformity of decision does not bar state action'. Id. at 123".
The court further explained that "a Louisiana state court should respect Louisiana law unless there is some federal impediment to application of that law contained in federal legislation or a clearly applicable rule in the general maritime law." Green, 593 So.2d at 638. See also Daigle v. Coastal Marine, Inc., 488 So.2d 679, 682 (La.1986), a maritime tort case, in which the court explained that Louisiana substantive law controls except where it conflicts with federal law.

FAULT
State law applies to the issue of fault. In Daigle, supra, the court observed that Louisiana can extend the protection of LSA-C.C. Art. 2315 to its constitutional limits in personal injury actions involving Louisiana residents where Louisiana has a strong interest in the transaction and there is no conflict with federal law. See also Palestina v. Fernandez, 701 F.2d 438, 439 (5th Cir. 1983), in which the court adopted Louisiana law (general principles of negligence) in a case falling within admiralty jurisdiction but in all other respects "a garden variety state tort claim." In Green, supra, the court held that Louisiana law on strict liability, LSA-C.C. Art. 2317, applied as a supplement to the remedies available under the general maritime law in the maritime personal injury case before the court (involving a helicopter crash) since Article 2317 did not impermissibly conflict with the substantive general maritime law. Concerning products liability, in East River S.S. Corp. v. Transamerica Delaval, 476 U.S. 858, 864-66, 106 S.Ct. 2295, 2299, 90 L.Ed.2d 865 (1986), the United States Supreme Court joined the Courts of Appeal in recognizing products liability, including strict liability, as part of the general maritime law. We see no impediment to applying the Louisiana Products Liability Act, LSA-R.S. 9:2800.51 et seq., as a supplement to general maritime law in this otherwise "garden variety state tort claim."
In the case at hand, it is not seriously disputed that the boat was overpowered by rating. Even defendants' expert, Robert Kemp Taylor, agreed in this regard. Rather, the substantial issue is causation. Plaintiff's expert, John Deck, was of the opinion that the overpowering did not cause the accident, but was a contributing factor. As we appreciate his testimony, Deck was able to bring in overpowering as a contributing factor only in the event that a "chine trip" occurred. Deck explained that more horsepower produces more speed and given a *785 "chine trip," less control, because reaction is stronger with higher speeds.
The trial court accepted the "chine trip" theory as the explanation of the events which Everette Mayo testified occurred immediately prior to the impact with the tree. There is evidence suggesting that a chine trip did not occur. For instance, the three guest passengers did not report feeling an abrupt turn or pull prior to impacting the tree, nor did they report being thrown or swaying to the left prior to impact as is usual in a "chine trip." Moreover, Deck was originally of the opinion that Everette Mayo had somehow let go of the tiller and because of the position of the trim tab and because the motor was tilted in, a force was set up that turned the boat into a hard right turn. He was only able to bring in the "chine tripping" theory as a cause after he was able to recreate a "chine trip" on the Mississippi River after the motor was moved out (as opposed to in, the condition it was in at the time of the accident) with the decavitation plate parallel.
Under Federal Rule of Civil Procedure 52(a), findings of fact are reviewed under the "clearly erroneous" standard. Under Louisiana law, factual findings are reviewed under the manifest error-clearly wrong rule. Stobart v. State Through DOTD, 617 So.2d 880 (La.1993). The standards are substantially the same. However, the procedural law of Louisiana controls as to the scope of appellate review, Daigle, supra, citing Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986). Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be reversed unless manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). Moreover, the rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990). Although another fact-finder might well have found otherwise, the trial court was not clearly wrong in finding that a "chine trip" occurred and that overpowering was a cause of the accident.
The trial court found that several "acts" contributed to the accident. The court found that Fisher Marine breached a duty to provide a "warning" that the motor rating might change if the boat were reconfigured, which was a contributing factor to overpowering the boat. The court found that Nissan breached a duty to warn the motor dealer of the possibility of overpowering a reconfigured boat, which was a contributing factor to overpowering the boat. The court also found that Red River Marine breached its duty to install a proper motor, which was a contributing factor to the overpowering of the boat. Finally, the trial court found Everette Mayo at fault in the operation and maintenance of the boat.
Since Fisher Marine and Nissan are manufacturers, the Louisiana Products Liability Act, LSA-R.S. 9:2800.51, et seq., establishes the exclusive theories of liability for them. The Act provides that "[a] product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product." LSA-R.S. 9:2800.57(A). We find no clear error in the trial court's conclusion that Fisher Marine and Nissan breached a duty to warn of the dangers of using a motor as rated for a console-steered boat on a reconfigured tiller-steered boat.
Likewise, we find no clear error in the trial court's finding of fault on the part of Red River Marine. Red River Marine was aware that the boat was reconfigured. As dealer and installer, Red River Marine at least should have known of the dangers of installing the 55 horsepower tiller-steered motor on the reconfigured boat and should have refrained from installing the motor. Red River Marine urges, among other things, that Louisiana law is applicable on the issue and that it was merely Nissan's agent as per the sale. Even plaintiff urges in brief that Red River Marine was the agent of Nissan and that Nissan should bear the fault of Red *786 River Marine. However, even assuming Louisiana law applies and Red River Marine was Nissan's agent, a principal is not liable for the physical torts of a non-servant agent; only when the relationship of the parties includes the principal's right to control physical details of the actor as to the manner of his performance, which is characteristic of the relation of master and servant, does the person in whose service the act is done become subject to liability for the physical tortious conduct of the actor. Rowell v. Carter Mobile Homes, Inc., 500 So.2d 748 (La.1987). While Nissan had a dealership agreement with Red River Marine and offered training on how to repair motors, we have not found evidence that Nissan had the necessary right of control over Red River Marine so as to impose liability on Nissan for Red River Marine's physical torts.
Additionally, we find no clear error in the trial court's finding of fault on the part of Everette Mayo.
Finally, we find no clear error in the apportionment of fault among the tortfeasors.

SPOUSE'S IMPUTED NEGLIGENCE
Plaintiff argues the trial court erred in imputing Everette Mayo's fault to Louella Mayo. Although it is not clear if and how the trial court applied it in this case, the trial court concluded that Louisiana jurisprudence allows for reduction of one spouse's recovery by the comparative fault of the other spouse, citing Brown v. State Through DOTD, 572 So.2d 1058 (La.App. 5th Cir.1990), writ denied, 581 So.2d 710 (La.1991) and Bienvenu v. State Farm Mut. Auto. Ins. Co., 545 So.2d 581 (La.App. 5th Cir.1989).
We find Brown inapplicable as it involved wrongful death and survival actions and the reduction of damages based on the decedent's fault. We agree with the result in Bienvenu. (See infra). However, our jurisprudence has held that unless a plaintiff could be held responsible, as a matter of law, for the torts of the person whose negligence is sought to be charged to him, the doctrine of imputed negligence cannot be applied. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (La.1963); Lewis v. Till, 395 So.2d 737 (La.1981).
In Lewis, the plaintiff-parents sought damages for the death of their eighteen month old son who was hit by a truck. Negligence was averred on the part of the driver of the truck. However, various defendants alleged contributory negligence on the part of the mother; there was no allegation of negligence on the part of the father. The issue was whether any negligence of the mother could be imputed to the father to bar his survival and wrongful death actions. The court held that if the mother was negligent, the father's right to recover was unaffected. The court explained:
"There is no sound reason for imputing any negligence by the mother to the father. The obligations of the civil contract of marriage do not include liability for a spouse's torts. Adams v. Golson, 187 La. 363, 174 So. 876 (1937). Vitale v. Checker-Cab Co., 166 La. 527, 117 So. 579 (1928) held that a husband's negligence is not imputed to the wife to prevent recovery for her injuries caused by that negligence but does bar her action for his wrongful death.... An innocent party should not be barred from recovery because of an irrelevant legal relationship with a negligent party. Negligence of either spouse cannot be imputed to the other merely because of the marital relationship. Gaspard v. LeMaire, supra."
395 So.2d at 738, 739.
Accordingly, we hold that imputation of Reverend Mayo's negligence to Mrs. Mayo on the basis of the marital relation would be improper. We are not aware of any general maritime law or policy to the contrary.
Red River Marine asserts that LSA-R.S. 34:851.18 is applicable in holding Louella Mayo, as co-owner of the boat, equally responsible for any negligent operation of her boat. LSA-R.S. 34:851.18 provides:
"A. The owner of a watercraft shall be liable for any injury or damage occasioned by the negligent operation of such watercraft whether such negligence consists of a violation of the provisions of the statutes of this state or in the failure to observe such *787 ordinary care in such operation as the rules of the common law require.
B. The owner shall not be liable, however, unless such watercraft is being used with his or her express or implied consent. It shall be presumed that such watercraft is being operated with the knowledge and consent of the owner if, at the time of the injury or damage, it is under the control of his or her husband, wife, father, mother, brother, sister, son, daughter, or other immediate member of the family."
However, under maritime tort law, negligence in the operation of a vessel creates a right of recovery in all who are injured by the negligence. Byrd v. Byrd, 657 F.2d 615 (4th Cir.1981). Even assuming that the application of this state statute to the facts of this case would preclude or reduce recovery under the doctrine of confusion (see LSA-C.C. Art. 1903), we find that such application of the statute would operate to defeat a substantial admiralty right of recovery. Therefore, the statute cannot be so applied. See also Armour v. Gradler, 448 F.Supp. 741 (D.C.W.D.1978) in which the court held that the mere maritime negligence of a husband could not be imputed to his wife simply because she was a co-owner of the boat involved in the case.
Nissan also asserts that Louella Mayo would be barred by the doctrine of confusion from recovering damages for fault that should be attributed to her as co-owner of the allegedly defective boat. The trial court did note at least one possible defect in the boat/motor rig. It appears that the boat/motor rig was a community asset; therefore, Louella Mayo would have been a co-owner of the boat/motor rig.
However, LSA-C.C. Art. 2317 imposes strict liability based on a person's relationship of custody (garde) to a defective thing which creates an unreasonable risk of injury to others. Doughty v. Insured Lloyds Ins. Co., 576 So.2d 461 (La.1991). Although ownership creates the presumption of garde, this presumption is rebuttable by the owner. Id. Whether the law imposes a duty of garde is a factual inquiry. Id.
In Doughty, a husband and wife brought survival and wrongful death actions for the injuries and death of their son who was killed when a defective "planer" in a sawmill ejected a sharp piece of wood which struck him. The planer was purchased during the existence of the community and was community property. At issue on appeal was whether the wife was precluded from recovering damages under the doctrine of confusion. The court found that the wife had sustained the burden of proving that, despite her ownership interest, she did not have garde of the planer which killed her son, and thus was not at fault for his death and was not precluded from recovering. In so holding, the court explained:
"In this case, presumably Mrs. Doughty derived some benefit from the planer in that it was part of her husband's business which provided income to the community in which she shared. However, it does not appear from the record that the planer was the main piece of equipment which sustained the profitability of the business. It had been purchased only three or four years before the accident and was used only about once a week. Thus, although she received a benefit from the ownership, the benefit was not substantial.
In a practical sense, Mrs. Doughty had no control or authority over the defective planer. The evidence indicated that she never visited the mill. Mrs. Doughty did not buy the machinery in question; she did not install it or operate it. Her sole relationship to the planer stems from the fact that the planer was purchased during the existence of the community and was community property. La.Civ.Code arts. 2338, 2340.
Although article 2346 of the civil code states the general principle that each spouse has the equal right to manage community property without the consent or concurrence of the other, article 2350 provides an exception. It states:
The spouse who is the sole manager of a community enterprise has the exclusive right to alienate, encumber, or lease its movables unless the movables are issued in the name of the other spouse or the *788 concurrence of the other spouse is required by law.
Clearly, Henry Doughty was the sole manager of the community enterprise, the sawmill, and had the exclusive right to alienate, encumber, or lease its movables. Mrs. Doughty's ownership interest gave her no authority or control over the operation of her husband's business or over its movables. Her ownership interest in the defective planer was remote. Unlike other owners, the owner of community property cannot judicially partition it during the existence of the community. La.Civ.Code art. 2336. Mrs. Doughty had only the contingent right to claim half ownership of the planer in the event that the community property regime was dissolved. Although she was an owner by virtue of the community property laws, she was not in a better position than an innocent victim to detect, evaluate or take steps to eliminate an unreasonable risk of harm arising in the defective planer."
Id. at 464-5.
Likewise, in the case before us, the record does not support that Louella Mayo received a substantial benefit from the ownership of the boat/motor. She testified that she had not been in a boat since 1973, explaining that she did not "boat" very often because she is given to headaches and the sun makes her have headaches. Moreover, Everette Mayo testified that he had not done any commercial fishing since he bought the boat. Also, we have found no evidence that Louella Mayo had any control or authority over the boat. Rather, it appears that the boat was for the recreational use of her husband and sons. Accordingly, we find that Louella Mayo lacked the necessary benefit from and control over the boat/motor to support a finding of garde or custody. As in Doughty, Louella Mayo's ownership interest in the boat/motor rig was remote. Thus, she was not at fault for any defect in the boat/motor rig and is not precluded, on the basis of confusion, from recovering her full damages.

GENERAL DAMAGES
The trial court awarded plaintiff $600,000 in general damages. "[T]he discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages.... It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). We find no abuse of discretion.

SOLIDARY LIABILITY
The trial court held Nissan and Red River Marine each responsible only for its virile share of 11% of plaintiff's damages. On appeal, plaintiff contends that the trial court erred in failing to apply general maritime law to the issue of solidarity and in failing to cast each defendant liable, in solido, for the entire amount of the judgment.
The civilian concept of in solido liability in tort is synonymous with the common law phrase "joint and several" liability. Touchard v. Williams, 617 So.2d 885 (La. 1993). Under maritime law, concurrent tortfeasors are jointly liable. Loeber v. U.S., 803 F.Supp. 1154 (E.D.La.1992), citing Cooper Stevedoring Co., Inc. v. Fritz Kopke, Inc., 417 U.S. 106, 108-10, 94 S.Ct. 2174, 2176, 40 L.Ed.2d 694 (1974) and Simeon v. T. Smith & Son, Inc., 852 F.2d 1421, 1428 (5th Cir. 1988), cert. denied, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). In admiralty cases, an innocent plaintiff may recover his full damages from any one of two or more joint tortfeasors, leaving that tortfeasor to seek contribution or indemnity from its co-tortfeasors. Transorient Navigators Co., S.A. v. M/S Southwind, 788 F.2d 288 (5th Cir.1986). One of several tortfeasors can be held liable for that portion of fault attributable to another tortfeasor even when a tortfeasor's portion of fault is less than that of the plaintiff. Daigle v. Coastal Marine, Inc., 500 So.2d 823 (La.App. 1st Cir.1986), citing Daigle, supra, n. 2, and Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979).
*789 However, under Louisiana law, LSA-C.C. Art. 2324, a judgment creditor is precluded from securing 100% recovery from one or another of the joint tortfeasors, except where the tortfeasors commit "an intentional or willful act," or a given tortfeasor is assigned 100% of the fault. Touchard, supra. Rather, a judgment debtor's exposure is limited, in the absence of a greater than 50% assignment of that debtor's fault, to 50% of the plaintiff's "recoverable damages," unless the judgment creditor is assigned a greater degree of fault than the given tortfeasor, in which case the judgment debtor is limited to the tortfeasor's assigned percentage of fault. LSA-C.C. Art. 2324; Touchard, supra.
It is clear that there is a conflict between maritime and state law regarding the extent of exposure for joint tortfeasors. In Coats v. Penrod Drilling Corp., 5 F.3d 877 (5th Cir.1993), a co-tortfeasor-defendant pointed out that at least thirty-three states had either abolished or modified the doctrine of "joint and several" liability and urged the court to change federal maritime law based on this statement of policy. The court stated:
"We are well aware of our duty as an admiralty court to look to legislative enactments for policy guidance. Miles v. Apex Marine Corp., 498 U.S. 19, 27, 111 S.Ct. 317, 323, 112 L.Ed.2d 275 (1990); Moragne v. States Marine Lines, 398 U.S. 375, 387-93, 90 S.Ct. 1772, 1781-83, 26 L.Ed.2d 339 (1970). However, this change in policy among the states is in conflict with the maritime policy recognized in Simeon:

To date, under general maritime [law], the policy of the Supreme Court has been clearensure that injured plaintiffs are made whole, even at the expense of overburdening defendants.
852 F.2d at 1454 (citing Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 271-72 n. 30, 99 S.Ct. 2753, 2762 n. 30, 61 L.Ed.2d 521 (1979)) (King, J., joined by Williams, J., specially concurring). While a strong statement of policy from the states has much force in this context, that sentiment must nevertheless give way to a contrary policy established by the Supreme."
5 F.3d at 889-90.
Since there is a clearly applicable rule in the general maritime law and Louisiana law conflicts with the general maritime law, we must apply general maritime law on the issue.
Before ending the discussion on this assignment of error, we note a change in maritime law on the effect that Fisher Marine's settlement has on the amount plaintiff is entitled to recover from the non-settling tortfeasors, Nissan and Red River Marine.
In the recent opinion of McDermott, Inc. v. AmClyde, ___ U.S. ___, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994), the United States Supreme Court reversed the Fifth Circuit's long-standing rule that a nonsettling tortfeasor is entitled to full credit in the amount the plaintiff received from a settling tortfeasor. See, Constructores Tecnicos v. Sea-Land Service, 945 F.2d 841 (5th Cir.1991). Instead, the Supreme Court held in McDermott that a plaintiff's settlement with one tortfeasor will dismiss his recovery against the nonsettling tortfeasors by the amount of the equitable share of the obligation of the settling tortfeasor, i.e., the percentage of the proportionate fault of the released obligor.
Accordingly, plaintiff is entitled to recover up to 100% of her damages from either Nissan or Red River, less the amount of the equitable share (proportion of fault) of the obligation of Fisher Marine, the settling tortfeasor.

INTEREST
The trial court awarded legal interest from the date of judicial demand rather than from the date of the accident. Plaintiff contends this was error.
Prejudgment interest on a maritime tort claim is governed by general maritime law. McDermott, Inc. v. Iron, 979 F.2d 1068 (5th Cir.1992), reversed on other grounds, ___ U.S. ___, 114 S.Ct. 1461, 128 L.Ed.2d 148. The awarding of prejudgment interest from the date of loss is the rule under general maritime law. Noritake Co., *790 Inc. v. M/V Hellenic Champion, 627 F.2d 724 (5th Cir.1980). It is only under certain circumstances that a trial court has discretion to deny prejudgment interest.
"Discretion to deny prejudgment interest is created only when there are `peculiar circumstances' that would make it inequitable for the losing party to be forced to pay prejudgment interest." Id. at 728. (Footnote omitted.)
See also, Corliss v. Elevating Boats, Inc., 599 So.2d 434 (La.App. 4th Cir.1992).
In the case sub judice, the trial court gave no indications that there were peculiar circumstances. Accordingly, we find that it was clearly wrong for it to limit prejudgment interest to the date of judicial demand. Therefore we shall amend the judgment to award interest from the date of injury for all past damages.

THIRD-PARTY DEMANDS OF NISSAN AND RED RIVER MARINE AND DISMISSAL OF EVERETTE MAYO'S APPEAL
After we initially heard oral argument in the case sub judice, we granted the litigants a second oral argument limited to the following question:
In the event this court reversed the trial court judgment on the issue of solidarity, are the defendants entitled to contribution from Everette Mayo, who was dismissed from the proceedings, and no one assigns his dismissal as an assignment of error?
Since we have found merit to Louella Mayo's appeal with regard to solidarity, we must answer the question we raised in the second oral argument.
In the trial court, Louella Mayo did not name her husband, Everette, as a defendant. Instead, Nissan and Red River Marine filed third-party demands against Everette Mayo for contribution. After trial on the merits, the trial court signed the judgment which stated in part:
"It is further ORDERED, ADJUDGED, AND DECREED, that the defendants are liable only for their respective virile shares or 11% of the total Judgment, it is by reason thereof, ORDERED, ADJUDGED, AND DECREED that all third party demands filed by Nissan Industrial Equipment Company and Red River Marine, Inc. against Everette Mayo, Sr. are hereby dismissed."
Although Nissan and Red River Marine appealed the judgment, they restricted their assignments of error to questions of their negligence, the assignment of less than 100% fault to Everette Mayo, and the excessiveness of the damage award. Not one mention was made in brief or their assignments of error to the dismissal of their third-party demands against Everette Mayo, even though Louella Mayo specifically assigned as error in her appeal that the trial court erred in failing to cast Nissan and Red River Marine liable in solido for the entire amount of the judgment.
It has long been held that when an appellee whose reconventional demand has been dismissed files no answer to the appeal, the reconventional demand can not be reviewed. Morgavi v. Mumme, 270 So.2d 540 (La.1972). See also, Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971); Oil Purchasers, Inc. v. Kuehling, 334 So.2d 420 (La.1976).
A rule like that described in Morgavi has been recognized with regard to the dismissal of third-party demands. Breshers v. DOTD, State of LA., 536 So.2d 733 (La.App. 3rd Cir.1988), writs denied, 541 So.2d 854, 856 (La.1989). In Breshers, we refused to consider the third-party demand of Grant Parish after we reversed the trial court's decision which had found Grant Parish not liable to the plaintiff. Since Grant Parish neither appealed nor answered the appeals, we found that it forfeited its right to alter that lower court judgment which dismissed its third-party demand.
In the present case, we are presented with a situation similar to Breshers. Unlike Breshers, we note, though, that Nissan and Red River appealed aspects of the lower court judgment. Nevertheless, it is long been our rule that we will only address issues that have been submitted to the trial court and raised in specifications of error on appeal, unless the interest of justice require *791 otherwise. Rule 1-3, Uniform Rules, Courts of Appeal. Complementing that rule, Rule 2-12.4 provides that even though an assignment of error is made, the appellate court may consider it abandoned if it is not briefed.
The judgment dismissing the third-party demands against Everette Mayo is final. Nissan and Red River Marine did not appeal from this judgment and we are powerless to revive it. Although Everette Mayo appealed, it did not revive the judgment dismissing the third-party demands as he was attacking only his assigned fault. Accordingly, since the judgment of dismissal was not appealed, we are powerless to revive it.
Nissan and Red River have not been blindsided by the issue since one of the thrusts of Louella Mayo's appeal was an attack on the trial court's determination that they were not solidarily liable for the judgment; this was the legal basis upon which the trial court dismissed defendants' third-party demands.
Having found that the judgment on the third-party demand is not before us, we likewise grant Red River Marine's motion to dismiss Everette Mayo's appeal, since his involvement in this judgment is linked only to the third-party demands of Nissan and Red River Marine against him.

DISPOSITION
For the foregoing reasons, we reverse the trial court's finding on the issue of solidary liability and find defendants solidarily liable. Thus, Red River Marine and Nissan are liable for the full amount of plaintiff's damages, less that amount calculated with reference to the jury's allocation of 11% proportionate responsibility to Fisher Marine, the settling tortfeasor.
We recast the judgment as follows: IT IS ORDERED, ADJUDGED, AND DECREED that there be and is judgment in favor of Louella Mayo and against Nissan Industrial Equipment Company and Red River Marine, Inc., in solido, in the sum of Seven Hundred Forty-Six Thousand Seven Hundred Three and 77/100 DOLLARS ($838,993.00 less $92,289.23, which is the 11% attributed to Fisher Marine, equals $746,703.77).
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Nissan Industrial Equipment Company and Red River Marine, Inc. pay legal interest from date of injury until paid to Louella Mayo for all past damages and pay unto Louella Mayo legal interest from date of judicial demand until paid on sums awarded Louella Mayo.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Nissan Industrial Equipment Company and Red River Marine, Inc. pay all costs of this appeal. In all other respects, we affirm the trial court judgment.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.
CULPEPPER, J. Pro Tem., dissents in part and assigns reasons.
LaBORDE, J., dissents in part for the reasons assigned by CULPEPPER, J. Pro Tem.
WILLIAM A. CULPEPPER, Judge Pro Tem., dissenting in part.
I dissent from that part of the majority opinion which holds that the third party demands by Nissan and Red River against Everette Mayo, Sr., cannot be considered on appeal because they did not assign as error the dismissal by the trial court of these third party demands. The pertinent facts are that the trial court dismissed these third party demands because it held there is no solidary liability by the parties at fault, i.e. Nissan, Fisher Marine, Red River and Everette Mayo. Plaintiff appealed, contending the liability of the defendants is solidary. Everette Mayo, Sr., although not a defendant in the trial court, filed an appeal as a third party defendant, obviously to protect himself in the event the court of appeal held solidary liability by him and the defendants. Nissan appealed. Red River answered the appeal, which, as against an appellant, Everette Mayo, is sufficient to seek modification of the judgment.
On appeal, Nissan and Red River assigned as error the finding by the trial court that they were at fault. They did not assign as error the finding by the trial court that *792 there is no solidary liability, because they agreed with the trial court that there is no solidary liability. And if there is no solidary liability, then the third party demands must be rejected. However, since this court of appeal has found the defendants are solidarily liable, Nissan and Red River are automatically, as a matter of law, entitled to judgment on their third party demands against Everette Mayo, Sr.
If Nissan and Red River had made assignments of error as to the third party demands, they would have to have been in the alternative and in the event the court of appeal reversed the trial court on the issue of solidarity. Maybe some attorneys would have made such an alternative assignment of error. Some would not. It was simply a discretionary matter depending on the strategy of the attorneys.
There can be absolutely no question that the court of appeal has the right to consider the third party demands, even though there were no assignments of error. LSA-C.C.P. Art. 2129 and Official Revision Comment read as follows:
Art. 2129. Assignment of errors unnecessary; exception
An assignment of errors is not necessary in any appeal. Where the appellant designates only portions of the record as the record on appeal, he must serve with his designation a concise statement of the points on which he intends to rely, and the appeal shall be limited to those points.
Source: Fed.Rule 75(d); cf. C.P. Arts. 896, 897.
Official Revision Comment
The jurisprudence has construed Arts. 896 and 897, Code of Practice of 1870, to the effect that where the transcript is certified as containing all the testimony and the grounds for reversal are apparent from the face of the record, no assignment of errors is necessary. Bossier v. Caradine, 18 La.Ann. 261 (1866); In re Fazende, 35 La.Ann. 1145 (1883); Havana American Co. v. Board of Assessors, 105 La. 471, 29 So. 938 (1901).
Code of Practice of 1970, Art. 896 provided that if the copy of the record brought up from the trial court was not certified by the clerk of the lower court as containing all of the testimony adduced, the supreme court would only judge the case on a statement of facts. Article 897 provided that an appellant who did not rely wholly or in part on a statement of facts, an exception to the judge's opinion, or a special verdict, but on an error of law appearing on the face of the record, would be allowed a period of ten days after the record was brought up to file a statement specifically alleging any errors. The Official Revision Comment under LSA-C.C.P. Art. 2129 indicates the jurisprudence under the old Code of Practice Articles construed them to mean that where the transcript is certified as containing all of the testimony and the grounds for reversal are apparent from the face of the record, no assignment of errors was necessary. This jurisprudence was simply codified in LSA-C.C.P. Art. 2129.
Moreover, LSA-C.C.P. Art. 2164 and the Official Revision Comments thereunder state:
Art. 2164. Scope of appeal and action to be taken; costs
The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal. The court may award damages for frivolous appeal; and may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as in its judgment may be considered equitable.
Source: Former R.S. 13:4444; cf. C.P. Arts. 894-897, 902, 905-907.
Official Revision Comments
(a) The purpose of this article is to give the appellate court complete freedom to do justice on the record irrespective of whether a particular legal point or theory was made, argued, or passed on by the court below. This article insures that the "theory of a case" doctrine, which has served to introduce the worst features of the common law writ system into Louisiana is not applicable to appeals under this Code.

*793 See Hubert, The Theory of a Case in Louisiana, 24 Tul.L.Rev. 66 (1949).
Under LSA-C.C.P. Arts. 2129 and 2164 quoted above, it is clear the court of appeal has the right to consider the third party demands in the present case even though there was no assignment of error in that regard. The entire record in the present case was transcribed. Thus, the appellate court can consider any issue of fact or law presented by that record, and, moreover, can render any judgment which is just, legal and proper upon the record on appeal.
The majority applies the Uniform Rules of Louisiana Courts of Appeal, Rule 1-3 which reads as follows:
RULE 1-3. SCOPE OF REVIEW
The scope of review in all cases within the appellate and supervisory jurisdiction of the Courts of Appeal shall be as provided by LSA-Const. Art. 5, § 10(B), and as otherwise provided by law. The Courts of Appeal will review only issues which were submitted to the trial court and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise.
Source: C.A., R 9A.
I will pretermit the interesting question as to whether the courts of appeal can refuse to consider issues not contained in assignments of error, in view of the Code of Civil Procedure Arts. 2129 and 2164. (In my view, any conflict between the Uniform Rules and the Code of Civil Procedure would have to be resolved in favor of application of the code.) However, in the present case it is not necessary to address this problem. As stated above, it was not necessary for the defendants to make an alternative assignment of error regarding the third party demand. Furthermore, when this case was reset for argument before a panel of five judges, the court specifically requested that the attorneys address the issue of the third party demands as to which there was no assignment of error. In response to this request by the court, the attorneys for the defendants briefed and argued the issue. Clearly the issue was properly presented to the court.
In the general discussion of assignments of error, 5 Am.Jur.2d 99-116, Appeal and Error, Sec. 648, it is stated that the purpose of assignments of error is to advise the appellate court and the appellee of the errors by the trial court complained of, so that discussion may be limited. Some jurisdictions have a "strict rule" requiring an assignment of error as mandatory for appellate review. Other jurisdictions have a "liberal rule" allowing appellate review even though the assignment of error is inadequate or entirely lacking. In courts which have a liberal rule, the absence or insufficiency of an assignment of error is not jurisdictional and will not be cause to reject an issue unless the failure has prejudiced the appellee in some way.
It is obvious that Louisiana follows the "liberal rule". LSA-C.C.P. Art. 2129 quoted above, expressly provides an assignment of error is not necessary in any appeal, unless only a portion of the record has been designated for appeal. LSA-C.C.P. Art. 2164 allows the appellate court to render any judgment which is just, legal and proper upon the record on appeal, regardless of assignments of error. The only possible basis for excluding our review of the third party demand in the present case is Rule 1-3 of the Uniform Rules of the Courts of Appeal, and even that rule expressly provides that if the interest of justice requires it, the court of appeal should consider an issue as to which there was no assignment of error.
Although I do not think it is necessary to reach this argument, the interest of justice in the present case clearly requires the third party demand be considered. There was no prejudice to Reverend Mayo, the third party defendant. He knew one of the principal issues on appeal was going to be the solidary liability of the defendants, Red River and Nissan. Reverend Mayo even filed an appeal to protect himself in the event the appellate court reversed the trial court on this issue. Thus, Reverend Mayo was neither surprised nor prejudiced by any deficiency in the assignments of error. Under the facts found by the trial court and affirmed by this court, 67% of the fault is attributable to Reverend Mayo. It would be manifestly unjust to deprive Red River and Nissan of their *794 third party demands against Reverend Mayo, based on the super technical argument that they should have made an assignment of error in the alternative.
The majority proclaims the judgment of the trial court dismissing the third party demands "as final," and states that we are "powerless to revive it." Of course, the judgment is "final" within the definition of final judgments in C.C.P. art. 1841, but it is appealable, C.C.P. art. 2083, and since it was appealed, it is not a "thing adjudged" as defined in C.C. Art. 3506 31.
For the reasons assigned, I would recognize the third party demands by Red River and Nissan against Everette Mayo.
NOTES
[*] Judge William A. Culpepper, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.
[1] See our docket W91-4, February 4, 1991.