831 So.2d 517 (2002)
James Elmer WARREN, Jr.
v.
SABINE TOWING AND TRANSPORTATION COMPANY, INC., et al.
No. 01 0573-CA.
Court of Appeal of Louisiana, Third Circuit.
October 30, 2002.
*521 Lawrence Emerson Abbott, Sarah Elizabeth Iiams, Monique M. Weiner, Abbott, Simses, Knister & Kuchler, New Orleans, LA, for Defendants/Appellants Conoco, Inc.
Dow Chemical Company, Richard E. Gerard, Jr., Scofield, Gerard, Veron, Singletary & Pohorelsky, Lake Charles, LA, for Defendant/Appellant Marathon Oil Company.
David LeRoy Hoskins, Attorney at Law, Lake Charles, LA, for Defendant/Appellant Chevron U.S.A., Inc., individually and as successor to Gulf Oil Company.
Louis C. Woolf, Woolf, McClane, Bright, Allen & Carpenter, L.L.C., Knoxville, TN, for Defendants/Appellants Marathon Oil Company Chevron U.S.A., Inc., individually and as successor to Gulf Oil Company.
William B. Baggett, Wells T. Watson, William B. Baggett, Jr., Baggett, McCall, Burgess & Watson, Lake Charles, LA, J. Edward Knoll, The Knoll Law Firm, Marksville, LA, J. Keith Hyde, Provost & Umphrey Law Firm, L.L.P., Beaumont, TX, for Plaintiff/Appellee James Elmer Warren, Jr./Evelyn Yvonne Warren.
Court composed of ULYSSES GENE THIBODEAUX, JIMMIE C. PETERS, and MICHAEL G. SULLIVAN, Judges.
PETERS, J.
This litigation arises from James Elmer Warren, Jr.'s exposure to benzene and benzene-containing products during the course of his employment with Sabine Towing and Transportation Company, Inc. (Sabine Towing). He initially brought suit against twenty-six defendants,[1] seeking *522 general, special, and punitive damages. After his death, Mr. Warren's widow, Evelyn Yvonne Warren, qualified as administratrix of his estate and continued the litigation as party plaintiff. Most of the originally named defendants settled before trial and were dismissed from the litigation. The matter ultimately went to trial with only Chevron U.S.A., Inc. (Chevron), individually and as successor to Gulf Oil Company (Gulf); Conoco, Inc. (Conoco); Marathon Oil Company (Marathon); and Dow Chemical Company (Dow) remaining as defendants. These defendants now appeal the trial court judgment rendered against them. Mrs. Warren has answered the appeal, seeking additional relief.

DISCUSSION OF THE RECORD
Mr. Warren began employment with Sabine Towing in 1944 as a seaman assigned to one of its vessels. At different times during his thirty-nine-year career with Sabine Towing, Mr. Warren held various positions, including seaman, quartermaster, boatswain, third mate, second mate, chief mate, and master. The United States Coast Guard certified Mr. Warren as qualified to hold the position of third mate in February of 1955; second mate in March of 1959; chief mate in July of 1964; and ship's master in July of 1970. At some point after each of these certifications, Sabine Towing promoted Mr. Warren. He retired in 1983, having served the last years of his career as ship's master.
In 1998, Mr. Warren was diagnosed as having myeloproliferative disorder, a blood disease. On December 4, 1998, he brought this suit, alleging that he contracted the disease as a result of exposure to the benzene and benzene-containing products he transported while working for Sabine Towing. The myeloproliferative disorder soon evolved into acute myelogenous leukemia (AML), and, on March 23, 2000, he died.
The five-day trial on the merits began on October 23, 2000. After completion of the evidence, the trial court took the matter under advisement and, on December 27, 2000, rendered a judgment awarding the following amounts:

Survival damages $2,000,000.00
Wrongful death damages
 Evelyn Yvonne Warren $ 500,000.00
 D'Juana Diane Hunter $ 200,000.00
 Donna Lynn Lott $ 200,000.00
Punitive damages $2,500,000.00[2]
Medical expenses $ 427,420.53
Funeral expenses $ 6,801.00

Regarding the survival damages and medical and funeral expenses, the trial court assessed fault as follows: Sabine Towing 33%; Chevron, individually25%; Conoco25%; Chevron, as successor to Gulf 10%; Marathon5%; and Dow2%. Regarding the wrongful death damages, the trial court reallocated the 33% fault of Sabine Towing to the remaining defendants as follows: Chevron, individually 37.313%; Conoco37.313%; Chevron, as *523 successor to Gulf14.925%; Marathon 7.462%; Dow2.985%.
In its reasons for judgment, the trial court concluded that Mr. Warren sustained substantial exposure to benzene and benzene-containing products manufactured by Chevron, Gulf, Conoco, and Marathon throughout his career with Sabine Towing. Further, the trial court concluded that this exposure was not limited to the shipping aspects of his employment, but extended to the processes of loading and unloading benzene and benzene-containing products at facilities owned and operated by Chevron, Gulf, Conoco, Marathon, and Dow. The trial court further concluded that Mr. Warren died of AML, that his death was a result of his benzene exposure, that the defendants had a duty to warn him about the long-term health hazards associated with benzene, and that they breached that duty.
The defendants have appealed, asserting a total of seventeen assignments of error. As a group, the defendants have raised six assignments of error common to them all:
(1) The trial court erred in concluding that the manufacturers of products transported by vessels on which [Mr. Warren] worked as a seaman, and in one instance simply the purchaser of the delivered product, owed a duty to protect [him] against allegedly injurious exposure to the product, when its risks were known to the seaman's employer.
(2) The trial court erred in concluding that the blood disorder contracted by [Mr. Warren] was caused by exposure to the products being transported on the vessels on which he served during his employment.
(3) The trial court erred by awarding non-pecuniary damages, including punitive damages, against the defendants: (a) when, such damages are not awardable under the Death on the High Seas Act, which governs the actions arising from the seaman's death, or under general maritime law; (b) when, even if punitive damages were awardable under general maritime law, there was a complete lack of evidence to support a conclusion that any of the defendants engaged in conduct which was willful or wanton in nature; and (c) in dividing the punitive damage award into five equal shares against the five defendants remaining in the case at trial.
(4) The trial court erred in its apportionment of fault, in that it (a) failed to assign percentages of fault to the defendants which settled out of the case prior to trial; (b) grossly underestimated the fault of the decedent's employer; and (c) re-allocated the fault of the employer to the remaining defendants in the wrongful death awards.
(5) The trial court erred in awarding wrongful death damages to the two surviving adult children, who never became plaintiffs in the litigation; and by awarding non-pecuniary damages in the wrongful death action after ruling that they could not be awarded in the survival action.
(6) The trial court erred in its evaluation of damages and award of judicial interest by (a) awarding $2 million in the survival action; (b) awarding $427,420.53 in medical expenses without accounting for the fact that a substantial portion of that sum was never charged to the plaintiff and her decedent as a result of the provisions of Medicare; and (c) awarding judicial interest from date of judicial demand on the wrongful death awards and the punitive damage awards.
Chevron has asserted the following assignments of error specific to it:
(1) The trial court erred in assessing punitive damages against [it], and particularly in assessing separate and duplicative *524 awards of punitive damages against [it] individually and [it] as the successor to Gulf.
(2) The trial court erred in admitting into evidence the depositions of Howard Runion, Roy Gibson, Dennis Tyburski, and William McClelland.
Conoco has asserted the following assignments of error specific to it:
(1) [It] had no duty, and certainly no "higher duty," to warn that exposure to the products which Mr. Warren transported could cause cancer, because none of the Conoco products which Mr. Warren transported were then or are today classified as human carcinogens.
(2) Assuming Conoco is liable, the trial court erred in its apportionment of 25% liability to Conoco (and 37.313% as to wrongful death damages).
(3) The trial court erred in awarding punitive damages against [it].
Marathon has asserted the following assignments of error specific to it:
(1) The trial court erred in apportioning five per cent (5%) of fault to [it] for which [Mr. Warren] hauled only two loads of gasoline over a thirty-nine year career.
(2) The trial court erred in awarding punitive damages against [it].
Dow has asserted the following assignments of error specific to it:
(1) The trial court erred in finding that [it] owed a duty to [Mr. Warren].
(2) The trial court erred in apportioning any fault at all against [it].
(3) The trial court erred in apportioning two percent (2%) of fault to [it].
(4) The trial court erred in awarding punitive damages against [it].
Mrs. Warren has answered the appeal, seeking an amendment to the trial court judgment to reflect that all damages be awarded solely to her as the personal representative of her husband's estate and seeking damages for loss of household services due to the illness and death of her husband.
Although the trial on the merits lasted only five days, it produced a voluminous evidentiary record consisting of trial testimony and exhibits, including the deposition testimony of Mr. Warren. Despite the nature of the litigation and size of the record, however, the factual background giving rise to the litigation is not in serious dispute.
During Mr. Warren's years of service, Sabine Towing held itself out to the petroleum industry as a qualified transporter of petroleum products, and, as such, its principal business was the transportation of crude oil, gasoline, airplane fuel, diesel, kerosene, benzene, toluene, xylene, naphtha, and other chemicals associated with the petrochemical industry. Each of Sabine Towing's ocean-going vessels was able to transport 135,000 barrels (or 5,670,000 gallons) of cargo in the twenty-six cargo tanks on board. Late in Mr. Warren's career, Sabine Towing brought some "jumbo" tankers on line which had double the capacity of the older vessels.
Of the petroleum and petrochemical products transported by Sabine Towing, almost all contained at least traces of benzene. Gasoline's benzene content varies from 0.2% to 5%; aviation gasoline from 5% to 10%; toluene from 0.005% to 5%; xylene from a trace to 0.01%; mineral spirits from a trace to 0.004%; naphtha from a trace to 7%; distillant gas from a trace to 60%; crude oil from a trace to 7%; and Number 2 oil from a trace to 10.3%. However, some petroleum and petrochemical products sometimes transported by Sabine Towing (diesel, hexane, cyclohexane, and kerosene) contain no trace of benzene.
*525 In the instant case, the evidence presented focused mainly on pure benzene and the benzene component of gasoline. Mr. Warren's deposition had been taken shortly before his death, and much of the evidence concerning his thirty-nine-year career was contained in that testimony. According to Mr. Warren, it was not until the 1960's that Sabine Towing began transporting anything other than gasoline or crude oil. He asserted that, from that time until his retirement, on ten or eleven occasions, vessels upon which he served transported pure benzene in all twenty-six cargo tanks and that, at numerous other times, his vessel carried partial loads of benzene. He estimated that pure benzene constituted approximately 5% of all cargo transported by Sabine Towing in vessels upon which he served and that gasoline constituted approximately 75% of all cargo. James Farrell Thomas, who at the time of his 1997 retirement from Sabine Towing held the position of general manager and senior vice president of the company's deep sea division, testified that Sabine Towing ceased transporting pure benzene in 1979. However, Sabine Towing continued to transport petroleum and petrochemical products which contained benzene.
Mr. Warren served his entire career on Sabine Towing's ocean-going vessels, transporting cargo between ports within the Gulf of Mexico, along the Atlantic seaboard, and in the Caribbean. He was exposed to benzene during the course of his duties in each of the positions he held during his career. Specifically, according to Mr. Warren, while in port, members of the crew participated in connecting and disconnecting the hoses supplied by the customer at dockside for loading and unloading the cargo, in gauging the storage tanks during the loading and unloading processes, and in topping off the tanks to achieve maximum capacity during the loading process. Additionally, when the customer's hoses were disconnected from the vessel, the crew helped to drain the residual product from the hoses into a drip pan situated on the vessel.
According to Mr. Warren, the loading and unloading processes generally took twenty-four hours. During that time, and after the customer's hoses were connected to the storage tanks on the vessels, members of the crew monitored the progress of the loading and unloading activities by periodically measuring the level of cargo in the vessel storage tanks. This was accomplished by extending a tape measure through the ullage cap hole, a ten-inch by twelve-inch hole located on the main hatch of each of the twenty-six storage tanks located on the vessel. During the loading and unloading processes, the main hatch and vent valves were closed and the ullage cap hole was the only place where the cargo's fumes could be vented. Therefore, the crew member performing this task suffered direct exposure to the escaping fumes. Similarly, during the loading process, when the tanks began to approach capacity, the crew member responsible for topping off a particular tank received direct exposure to the escaping fumes.
Even at sea, a crew member could not escape exposure to the fumes emitted from the cargo. During the voyage, the members of the crew took samples of the cargo through valves connected to each tank, thus releasing the fumes to the open air. Additionally, the crew disposed of the residual drained at the dockside into the open drip pans from the customer's hoses only after the vessel had traveled over fifty miles from shore. Until disposed of, the fumes emitted from this residue were detectible by anyone in close proximity.
After delivery of the cargo, the crew still suffered from exposure to the residual *526 fumes, particularly in the process of cleaning the tanks. The cleaning procedure required crew members to climb into each tank and sweep it free of debris and rust. Furthermore, in making the necessary repairs to the storage tanks, the crew members were again exposed to the residual fumes.
Mr. Warren testified that, generally, all crew members except the boatswain and ship's master were involved in every aspect of the cargo duty described above and that the boatswain, whose job involved the general upkeep of the ship, would participate when needed. Even his promotion to ship's master did not preclude Mr. Warren's exposure to cargo fumes. According to Mr. Warren, he believed in a hands-on approach to leadership and devoted approximately 20% of his time in port to assisting the crew in the loading and unloading processes.

OPINION
When substituted as party plaintiff, Mrs. Warren, as administratrix, requested "all relief applicable under the Jones Act and General Maritime Law" for herself and her two daughters, D'Juana Diane Hunter and Donna Lynn Lott, including "a claim for wrongful death and survival damages." Ms. Hunter and Ms. Lott did not individually join in the litigation, but Mrs. Warren's pleading asserted that she, as adiministratix, brought "a cause of action on behalf of herself as the surviving widow and children."
"A Jones Act cause of action may be invoked only by a seaman and may be asserted only against the seaman's employer...." Robert Force, The Curse of Miles v. Apex Marine Corp.: The Mischief of Seeking "Uniformity" and "Legislative Intent" in Maritime Personal Injury Cases, 55 La.L.Rev. 745, 745 (1995) (footnotes omitted). All claims against Sabine Towing, Mr. Warren's employer, have been settled, and, therefore, there remains no Jones Act cause of action. "Actions by seaman against non-employers may be brought under the general maritime law and are predicated on tortious conduct such as negligence...." Id. at 746. Thus, the liability of the remaining defendants must be considered in light of tort concepts.

Defendants' Common Assignments of Error Numbers One and Two, Conoco's Assignment of Error Number One, and Dow's Assignment of Error Number One
The defendants contend that the trial court erred in finding that Mr. Warren's blood disorder was caused by his exposure to the products transported on the vessels on which he served during his employment. Alternatively, they contend that the trial court erred in concluding that they had a duty to warn Mr. Warren about the dangers of benzene exposure when those dangers were know by his employer, Sabine Towing. In any event, the defendants contend that the trial court erred in concluding that they had a duty to warn of any dangers associated with benzene-containing products, such as gasoline, when gasoline, unlike pure benzene, is not characterized as a human carcinogen.
Mr. Warren contracted myeloproliferative disease, which evolved into AML. The defendants assert that Mrs. Warren proved only that AML can occur through contraction of myelodysplasia and through contraction of myeloproliferative blood disorder. They contend that, while the former is linked to benzene, Mr. Warren had the latter blood disorder, for which there is no proven link with benzene. The defendants assert that Mr. Warren's blood disease can be contracted by persons that have not been occupationally exposed to *527 any levels of benzene and that Mrs. Warren did nothing to establish that her husband's disease and progression to AML was any different from that encountered in the parts of the population not so exposed. Indeed, the defendants' expert in the field of hematology, Dr. Ethan A. Natelson, while acknowledging that benzene can cause AML, testified that "[t]here is no epidemiologic evidence concerning myeloproliferative disease and benzene."
However, Dr. Natelson's testimony does not stand alone on this issue. Dr. Eula Bingham, an expert in the fields of occupational environmental health and toxicology and the former head of the Occupational Safety and Health Administration (OSHA), testified that it is generally accepted in the scientific community that exposure to benzene, whether from pure benzene or benzene-containing products, can cause AML.
Dr. John Dement, an expert in the fields of industrial hygiene and epidemiology, testified that it is generally accepted within the epidemiological community that benzene is a cause of AML. He stated: "[T]here's ample scientific data supporting a causal link between benzene and AML. Also, this individual had, in my opinion, significant occupation[al] exposure to benzene. Within a reasonable degree of scientific certainty, I feel that his occupational exposure to benzene from gasoline and from benzene, itself, are significant factors in the cause of his ultimate AML."
Dr. Scott McKenney, Mr. Warren's treating physician and an expert in oncology, hematology, and internal medicine, testified that benzene is a carcinogen and is capable of damaging any of the blood cells in the bone marrow. He diagnosed Mr. Warren as having myeloproliferative disorder which evolved into AML. Dr. McKenney testified that myeloproliferative disorder as a class is a disorder of the clonal stem cell and that benzene, being harmful to the bone marrow, would also be harmful to the stem cell. While he acknowledged that the myeloproliferative disease that members of the general population develop can evolve into AML without any known occupational exposure to benzene, Dr. McKenney was of the opinion that Mr. Warren's exposure to benzene and benzene-containing products, which exposure he characterized as significant, was a significant contributing cause of his AML.
Dr. Frank H. Gardner, a physician expert in the fields of hematology, oncology, and the state of the art in causation, was of the opinion that Mr. Warren had a significant history of benzene exposure. He was also of the opinion that both Mr. Warren's antecedent blood disorder and the resultant AML were caused by his exposure to benzene. While he also acknowledged that people in the general population develop AML without any known occupational exposure to benzene, he testified that this was rare and that people who are occupationally exposed to benzene develop "an excess of AML over what would be expected from the general population."
While there is ample evidence linking benzene with AML, Dr. Dement admitted that there was no epidemiology linking benzene to the antecendent myeloproliferative disorders when considering these disorders as a group. He explained that there is a great overlap between all of the syndromes, including myeloproliferative and myelodysplastic syndromes, such that they are not separated out and studied individually. Additionally, as we appreciate his testimony, the ultimate outcome in many of these cases is leukemia in one form or another, such that the antecedent blood disorder would not be studied but the resultant leukemia would be studied instead. Similarly, Dr. Gardner also explained that myeloproliferative disease does not show up in epidemiological studies *528 because it usually evolves into another condition which becomes the final diagnosis. He also explained that myeloproliferative disease is not a term used; rather, physicians use the terms contained in their code books.
In light of the foregoing, we find that the record supports the trial court's finding that Mr. Warren's myeloproliferative disease evolved into AML, which was caused by Mr. Warren's occupational exposure to benzene. Further, we do not find that the trial court's conclusion in this regard is clearly wrong.
Moreover, the defendants do not dispute the trial court's factual finding that they never gave Mr. Warren or Sabine Towing any warning of the dangers of benzene exposure. Rather, they assert that the trial court erred in concluding that they owed Mr. Warren any duty to warn him of those dangers, particularly given Sabine Towing's knowledge of the dangers.
The duty question is one of law, while the question of whether the duty was breached is a factual question. Mallery v. Int'l Harvester Co., 96-321 (La.App. 3 Cir. 11/6/96), 690 So.2d 765, writ denied, 97-1323 (La.9/5/97), 700 So.2d 512. The United States Supreme Court has recognized products liability, including strict liability, as part of the general maritime law. See E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986); Mayo v. Nissan Motor Corp., 93-852 (La.App. 3 Cir. 6/22/94), 639 So.2d 773. Thus, the defendants in this matter are subject to certain duties imposed upon them by application of products and strict liability principles.
Because federal maritime law is not all inclusive, state law may be used to supplement it. Green v. Indus. Helicopters, Inc., 593 So.2d 634 (La.1992), cert. denied, 506 U.S. 819, 113 S.Ct. 65, 121 L.Ed.2d 32 (1992). Thus, in Mayo, this court found no impediment to applying the Louisiana Products Liability Act (LPLA), La.R.S. 9:2800.51, et seq., as a supplement to general maritime law under the facts of that case, which we classified as an "otherwise `garden variety state tort claim.'" Mayo, 639 So.2d at 784.
The LPLA was added to the Revised Statutes by Acts 1988, No. 64, § 1, effective September 1, 1988. Thus, by the time suit was filed in this matter and Mr. Warren had passed away, the LPLA was in effect. However, Mr. Warren's exposure to benzene and benzene-containing products occurred prior to its enactment. In Gilboy v. American Tobacco Co., 582 So.2d 1263 (La.1991), a case in which the exposure occurred and suit was filed prior to the enactment of the LPLA, the supreme court held that the LPLA alters substantive rights and is not retroactive. However, in Walls v. American Optical Corp., 98-0455, p. 4 (La.9/8/99), 740 So.2d 1262, 1266, the supreme court explained "that a law may permissibly change the future consequences of an act and even the consequences of acts committed prior to the law's enactment without operating retroactively." However, in the instant case, because the LPLA evaluates the conditions of the defendants' liability, it would operate retroactively. See id. at 1268 n. 5; Pitre v. GAF Corp., 97-1024 (La.App. 1 Cir. 12/29/97), 705 So.2d 1149, writ denied, 98-0723 (La.11/19/99), 749 So.2d 666. Thus, the LPLA is inapplicable to this case, and we therefore apply pre-LPLA law in our review.
The applicable elements of a strict tort products liability action under pre-LPLA law are set forth in Halphen v. Johns-Manville Sales Corp., 484 So.2d 110, 113 (La.1986), as follows:
In order to recover from a manufacturer, the plaintiff must prove that the *529 harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control. The plaintiff need not prove negligence by the maker in its manufacture or processing, since the manufacturer may be liable even though it exercised all possible care in the preparation and sale of its product.
The Halphen court recognized that some products are unreasonably dangerous because of a construction defect while others are unreasonably dangerous per se.[3] A product which does not contain a construction defect or which is not unreasonably dangerous per se,
may still be an unreasonably dangerous product if the manufacturer fails to adequately warn about a danger related to the way the product is designed. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. In performing this duty a manufacturer is held to the knowledge and skill of an expert. It must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby. A manufacturer also has a duty to test and inspect its product, and the extent of research and experiment must be commensurate with the dangers involved. Under the failure to warn theory evidence as to the knowledge and skill of an expert may be admissible in determining whether the manufacturer breached its duty.
Id. at 114-15 (citations omitted).
Additionally, "retailers of potentially dangerous products have a duty to warn purchasers of the dangers involved in using the product." Am. Ins. Co. v. Duo Fast Dixie, Inc., 367 So.2d 415, 417 (La.App. 4 Cir.1979).
Not only is there no dispute that the defendants failed to give any warnings to Sabine Towing or Mr. Warren, the defendants also do not dispute that the danger inherent in the use of benzene and benzene-containing products is not obvious to the ordinary user. Rather, the defendants assert that Sabine Towing, the intermediary between the defendants and Mr. Warren, is a "sophisticated entity" in the marketplace of petroleum products such that they had no duty to attempt to warn Mr. Warren or any other Sabine Towing employee.
Indeed, a manufacturer does not have a duty to warn when the user of the product is familiar with the product, making the user a "sophisticated user." Hines v. Remington Arms Co., Inc., 94-0455 (La.12/8/94), 648 So.2d 331. A sophisticated user may be presumed to know about the danger of a product due to familiarity with the product. Mallery, 690 So.2d 765.
Without getting into the semantics of whether or not Sabine Towing is technically classified as a "user" of benzene, it is certainly a sophisticated entity having knowledge of its dangers. Dr. Bingham testified that benzene has been linked to the causation of incurable life-threatening diseases since early in the twentieth century. In fact, there existed a known causal connection between leukemia and benzene as early as 1928. Also, Dr. Bingham testified that in 1939 a series of articles out of Harvard appeared that discussed the connection between benzene and leukemia. Additionally, Dr. Dement and Dr. Gardner *530 agreed with Dr. Bingham's assertions concerning the history of benzene research.
Further, Mrs. Warren's own expert in industrial hygiene and safety, Frank Parker, testified that the petroleum and petrochemical industries had knowledge prior to Mr. Warren's employment in 1944 that benzene caused damage to the blood and blood-forming organs. He explained that Coast Guard regulations identified benzene as toxic in the 1940's and that these regulations applied to Sabine Towing. Mr. Thomas, Sabine Towing's former vice president of the deep sea division, testified that Sabine Towing received information and publications from the Coast Guard during his tenure. In fact, according to Mr. Thomas, Sabine Towing discontinued transporting pure benzene in late 1979 in response to Coast Guard regulations. However, Mr. Thomas indicated that Sabine Towing did not discontinue hauling pure benzene at that time because of health concerns, but rather because of the need to maintain health records on the seamen.
Additionally, in 1948, the American Petroleum Institute (API) published a review on benzene which stated the following concerning the chronic effects of benzene exposure: "[R]easonably well documented instances of the development of leukemia as a result of chronic benzene exposure have been cited." Dr. Bingham testified that the cost of obtaining this document at the time it was published was twenty-five cents.
Sabine Towing was owned, at least in part, by Pure Oil Company such that it would have had access to all information available to the petroleum and petrochemical industries. Even so, Sabine Towing had been in the business of transporting benzene and benzene-containing products for decades. Mr. Parker was of the opinion that Sabine Towing, as a member of the maritime industry, was obligated to understand the hazards of the materials being hauled. The record clearly reveals that Sabine Towing either knew or should have known about the hazards of benzene early on such that it was a sophisticated entity to whom the defendants did not owe a duty to warn.
The owner of a vessel has an absolute and nondelegable duty to furnish a seaworthy vessel. Spell v. Am. Oilfield Divers, Inc., 98-498 (La.App. 3 Cir. 12/9/98), 722 So.2d 399, writs denied, 99-0065, 99-0074 (La.2/26/99), 738 So.2d 587, 589. However, the fact that Sabine Towing had a duty to warn its employees does not in all instances relieve a defendant of its duty. Rather, we must go on to consider whether the defendants owed Mr. Warren, an employee of Sabine Towing, a duty to warn where Sabine Towing was a sophisticated entity. In Damond v. Avondale Industries, Inc., 98-1275 (La.App. 4 Cir. 8/19/98), 718 So.2d 551, writ denied, 98-2854 (La.1/8/99), 735 So.2d 637, the plaintiff allegedly contracted silicosis while employed as a sandblaster using sand sold by the defendant to the plaintiff's employer. He sued the defendant/manufacturer of the sand supplied to his employer for failure to warn of the danger encountered while sandblasting with the sand. The defendant had not altered the sand and had provided a warning to the plaintiff's employer on the invoices. The fourth circuit noted that OSHA regulations provided detailed instructions on the equipment to be used in sandblasting and that the plaintiff's employer was presumed to know of the dangers in the use of sand in sandblasting because of its familiarity with the product and because of the OSHA regulations. The fourth circuit found that, under these circumstances, the warning on the invoices was more than adequate. Nevertheless, the issue was whether the defendant *531 had a duty to give a direct warning to the plaintiff as an employee. In that regard, the fourth circuit concluded:
[W]hile [the defendant] might have known that its sand would be used in sandblasting, it had no control over how [the employer] would conduct its operations in that regard. Finally, under the circumstances of this case, we cannot conclude that a supplier like [the defendant] could, as a practical matter, give warnings to those employed as sandblasters like the plaintiff. The warning it gave to [the employer] was adequate, and it was [the employer's] duty to comply with the safety requirements for its employees engaged in sandblasting.
Id. at 553. See also Cowart v. Avondale Indus., Inc., 01-0894 (La.App. 4 Cir. 7/3/01), 792 So.2d 73, writ denied, 01-2719 (La.1/4/02), 805 So.2d 211.
However, in the instant case, much of Mr. Warren's exposure to benzene and benzene-containing products occurred at the defendants' facilities during the loading and unloading processes. Mr. Warren testified that he had contact with various employees of the oil/chemical companies while loading or discharging the products. In fact, he testified: "When you get in there, they would have a man down there representing the company to tell you how you was [sic] going to load and everything." Further, Chevron even chartered Sabine Towing vessels on occasion to accommodate its shipping needs. Thus, unlike in Damond, the defendants had some control over how Mr. Warren conducted the operations. Additionally, unlike in Damond, the defendants could have given warnings to Mr. Warren as a practical matter. Because of the direct contact between Mr. Warren and the defendants and because the defendants maintained some control over aspects of the operations, we find that they had a duty to directly warn Mr. Warren. Therefore, we reject the defendants' assignment of error in this regard.
We also reject the defendants' argument that, because gasoline is not itself characterized as a human carcinogen, they had no duty to warn in that regard. Dr. Bingham, Dr. Dement, and Dr. Gardner agreed that the medical risks associated with benzene exposure extend to long-term exposure to benzene-containing products as well. Dr. Bingham explained that benzene is blended into motor gasolines. Mr. Parker testified that the amount of benzene found in gasoline is about 0.2 to 5%. While serving as the chief safety officer for the United States, Dr. Bingham was directly involved in research designed to promulgate concentration standards for mixtures containing benzene. Despite opposition from industry, her research group recommended "for mixtures, levels of one part per million ... in the mixture." If a product exceeded that content level, Dr. Bingham was of the opinion that the manufacturer should take safety measures, including posting carcinogenic risk signs and performing medical and industrial hygiene monitoring. Additionally, Mr. Parker stated the obvious: "You cannot expose people separate and distinct from benzene. When you expose them to gasoline, you expose them to benzene."
Accordingly, we find no error in the trial court's determination that the defendants had a duty to warn ordinary users, including Mr. Warren, about the dangers of benzene exposure from gasoline. In sum, we reject all of these assignments of error.

Defendants' Common Assignment of Error Number Three
In this assignment of error, the defendants assert that the trial court erred in awarding nonpecuniary damages, including punitive damages, because (1) nonpecuniary damages are not available under *532 the Death on the High Seas Act (DOHSA), 46 U.S.C. § 761, et seq., or under general maritime law and (2) even assuming punitive damages are allowable, there is no evidence to support a conclusion that the defendants engaged in willful and wanton conduct. Additionally, they assert that the trial court erred in dividing the award into five equal shares.
In addressing the punitive damages issue, we find it unnecessary to reach the issue of whether such damages are available under DOHSA or general maritime law because we find that the trial court was clearly wrong in awarding punitive damages on the evidence presented. For a plaintiff to be awarded punitive damages, the defendant's actions must constitute "intentional or wanton and reckless conduct" that amounts "to a conscious disregard for the rights of others." Poe v. PPG Indus., 00-1141, 00-1142, 00-581, p. 6 (La. App. 3 Cir. 3/28/01), 782 So.2d 1168, 1173, writ denied, 01-1239 (La.6/22/01), 794 So.2d 801. To be successful, "a plaintiff must establish a higher degree of fault than simple negligence." Bergeron v. Mike Hooks, Inc., 626 So.2d 724, 728 (La. App. 3 Cir.1993).
In the instant case, the evidence falls far short of this standard. Although the defendants failed in their duty to warn Mr. Warren of the dangers in exposure to benzene, they did not attempt to hide the information or mislead Mr. Warren to his detriment. Their lack of action constitutes breach of duty under the circumstances, and nothing more.
Additionally, our ruling on this assignment of error renders moot any consideration of Chevron's first and second assignments of error, Conoco's third assignment of error, Marathon's second assignment of error, and Dow's fourth assignment of error.

Defendants' Common Assignment of Error Number Four
In rendering its judgment, the trial court assessed 100% of the fault in causing Mr. Warren's illness and subsequent death to Sabine Towing and the four remaining defendants. The defendants assert that the trial court erred in failing to assign any percentage of fault to defendants who settled prior to trial, in grossly underestimating the fault of Sabine Towing, and in reallocating Sabine Towing's percentage of fault to the remaining defendants in the wrongful death awards. The plaintiffs have conceded in brief that the trial court erred in reallocating Sabine Towing's percentage of fault to the remaining defendants in the wrongful death awards. We find additional merit in the remainder of this assignment of error and reallocate fault accordingly.
Louisiana Civil Code Article 2323(A) provides in part:
In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.
(Emphasis added.)
Further, under federal law, the liability of the nonsettling defendants should be calculated with reference to the fact finder's allocation of proportionate responsibility rather than by giving the nonsettling defendants a credit for the dollar amount of the settlement. McDermott, Inc. v. AmClyde, 511 U.S. 202, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994).
*533 Mr. Warren's deposition was taken at a time when many of the original defendants were still parties to the litigation. In his deposition, Mr. Warren attempted to reconstruct his career by reference to his memory of past events, his log or journal kept after being promoted to ship's master, and Certificates of Discharge issued by the United States Coast Guard.[4] The subject matter of the deposition included reference to both defendants and non-defendants within the petroleum and petrochemical industries serviced by Sabine Towing during Mr. Warren's career. During his deposition, Mr. Warren identified the following companies as some of Sabine Towing's other petroleum and petrochemical customers: Phillips Petroleum, Exxon, ARCO, Shell, Cities Service, Ashland, Coastal Oil, Texaco, Amerada Hess, Tenneco, Union Oil, Murphy Oil, and Amoco.
The trial court appeared to apply the mandate of La.Civ.Code art. 2323(A) in that it assessed the fault of Sabine Towing, a settling defendant, vis-à-vis the five remaining nonsettling defendants. Thus, it must be inferred from this assessment that the trial court considered the fault of the other settling defendants and found them to be without fault in causing Mr. Warren's illness and subsequent death. The record does not support such a finding relative to the remaining settling defendants, and, therefore, we find that the trial court was clearly wrong in failing to find fault on the part of these settling defendants. Thus, this error is a manifest error of fact. "If a court of appeal finds that the trial court committed reversible error of law or manifest error of fact, the court of appeal must determine the facts de novo from the record and render a judgment on the merits." LeBlanc v. Stevenson, 00-0157, p. 3 (La.10/17/00), 770 So.2d 766, 770.
In performing a de novo review of the record, we find that Mr. Warren recalled that, of the ten to eleven occasions that vessels to which he was assigned transported full loads of pure benzene, the cargos were usually retrieved from a facility in Puerto Rico, although he testified that he did transport benzene from Chevron's Pascagoula, Mississippi facility as well. His only connection with Dow's Freeport, Texas facility was the delivery of two vessel loads of benzene, one on May 10, 1977, and the other on May 17, 1983. The remaining eight to nine benzene loads were transported to Monsanto at its Texas City, Texas facility. He testified that he transported only gasoline, diesel, and kerosene from Marathon's Garyville, Louisiana facility and from Conoco's Lake Charles, Louisiana facility. As between Marathon and Conoco, the latter was by far the largest customer, as Mr. Warren claimed to have transported cargo from Conoco's facility some fifty to sixty times between 1975 and 1976 alone. He testified that Chevron's Pascagoula, Mississippi facility provided gasoline cargos as well as benzene cargos.
Mr. Thomas disputed Mr. Warren's assertion that he loaded benzene at Chevron's facility. According to Mr. Thomas, Chevron did not ship benzene during his tenure with either company (1964-1974 with Chevron and 1974-1997 with Sabine Towing). However, Mr. Thomas did confirm that Chevron had a long-time business relationship with Sabine Towing. According to Mr. Thomas, in 1967 Chevron *534 even had four of Sabine Towing's five vessels chartered to accommodate its shipping needs. Additionally, at other times during his career with both Chevron and Sabine Towing, Chevron chartered Sabine Towing vessels for up to a year at a time.
Concerning the settling defendants, Mr. Warren testified that he delivered cargo for a number of them during his career. In the 1960's, he delivered gasoline for Phillips Petroleum from Puerto Rico to their Wilmington, North Carolina facility on approximately six occasions; delivered one load of benzene from ARCO's Houston, Texas facility to Savannah, Georgia; frequently delivered cargo from Shell's Norco, Louisiana facility to Tampa, Florida; delivered cargo numerous times from Puerto Rico to Ashland's facility in Baltimore, Maryland, during the 1950's and 1960's; delivered gasoline, diesel, and kerosene from Coastal Oil's Corpus Christi, Texas facility to various ports in the 1960's; infrequently delivered cargo from Texaco's Port Arthur, Texas facility to various ports in the 1970's; loaded cargo on two occasions at Tenneco's Chalmette, Louisiana facility; transported cargo from Murphy Oil's Norco, Louisiana facility to Tampa, Florida on numerous occasions in the early 1970's while he was either chief or second mate; transported cargo from Amoco's Texas City, Texas facility to Norfork, Virginia, in the 1960's and 1970's; transported cargo other than benzene for Union Oil; and transported cargo for Amerada Hess in the 1950's. Additionally, Mr. Warren testified that he transported cargo for Exxon and Cities Service during his career, although he did not name either as a defendant in the litigation.
Mr. Thomas confirmed Mr. Warren's testimony in regard to the settling defendants as well as other petroleum and petrochemical companies, although neither provided specific times, dates, and places. According to Mr. Thomas, Chevron was not the only company which chartered Sabine Towing vessels, and he identified at least eight other companies which used the charter advantage.
The supreme court, in Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985), set forth the criteria under which we should apportion fault:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
If we find manifest error in the trial court's apportionment of fault, we may adjust the trial court's award "only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion." Clement v. Frey, 95-1119, 95-1163, pp. 7-8, (La.1/16/96), 666 So.2d 607, 611. Applying these criteria to the case before us, we reapportion fault as follows: Chevron, individually and as successor to Gulf20%; Conoco9%; Marathon Oil 0.5%; Dow0.5%; Sabine Towing40%; and all other involved companies30%.
Our ruling on this assignment of error renders consideration of Marathon's first assignment of error, Conoco's second assignment *535 of error, and Dow's second and third assignments of error moot.

Defendants' Common Assignment of Error Number Five and Mrs. Warren's Answer to the Appeal
"Non-pecuniary compensatory damages may be defined as damages for injuries that cannot be quantified or measured in monetary terms." David W. Robertson, Admiralty and Maritime Litigation in State Court, 55 La.L.Rev. 685, 735 (1995). The defendants assert that "[t]he trial court erred in awarding wrongful death damages to the two surviving adult children, who never became plaintiffs in the litigation; and by awarding nonpecuniary damages in the wrongful death action after ruling that they could not be awarded in the survival action." Mrs. Warren has answered the defendants' appeal, asserting the following: "As per proper procedure, once James Warren died, the only plaintiff was Evelyn Yvonne Warren, as personal representative of the estate of James Warren. As such, the judgment and all items therein should be amended to be solely in favor of plaintiff, Evelyn Yvonne Warren, as personal representative of the estate of James Warren."
Specifically, in the fourth amending and supplemental petition, Mrs. Warren sought to be substituted as the party plaintiff following the death of her husband. She asserted in the petition the following:

37.
In addition, Evelyn Yvonne Warren, the personal representative of the estate of James Elmer Warren, Jr., brings a cause of action on behalf of herself as the surviving widow and children for all damages they have sustained and are entitled to in this case as a result of the untimely death of James Elmer Warren, Jr. This claim is being brought for funeral expenses as a result of the death of James Elmer Warren, Jr., loss of household services to his wife, Evelyn Yvonne Warren, and loss of nurture, training, and guidance to his children.
38.
As it relates to the nonemployer Defendants, Evelyn Yvonne Warren, personal representative of the estate of James Elmer Warren, Jr., brings a cause of action on behalf of herself as the surviving widow and children for their own mental anguish, grief, loss of love and affection, and their own pain and suffering as a result of the death of James Elmer Warren, Jr.
The amending and supplemental petition clearly asserted a claim on behalf of the adult children by Mrs. Warren, the personal representative of Mr. Warren's estate. "It is well settled that an action under the Jones Act, DOHSA and the general maritime law must be instituted by the personal representative of the decedent for and on behalf of the appropriate beneficiaries. The clear language of the Jones Act and DOHSA evinces the congressional intent to vest a right of action for maritime death solely in the personal representative." Benoit v. Fireman's Fund Ins. Co., 355 So.2d 892, 895-96 (La.1978) (citations omitted). Thus, Mrs. Warren was the proper party plaintiff to institute suit on behalf of her adult children.
Additionally, the defendants contend that the trial court erred in awarding nonpecuniary damages in the wrongful death action. It is clear from the trial court's reasons for judgment that its award of wrongful death damages was based solely on nonpecuniary elements. The defendants concede that there is a general maritime cause of action for the wrongful death of a seaman, see Miles v. Apex Marine Corp., 498 U.S. 19, 111 S.Ct. 317, 112 *536 L.Ed.2d 275 (1990), but contend that the remedy in such action is limited to pecuniary losses.
In Miles, a seaman was killed by a fellow crew member while the ship on which they served was docked. The seaman's mother sued the ship's operators, the charterer, and the ship's owner, alleging negligence under the Jones Act for failure to prevent the assault on her son and breach of the warranty of seaworthiness under the general maritime law. She sought damages for loss of society, among other damages.
While recognizing that there is a general maritime cause of action for the wrongful death of a seaman, the Miles Court found a limitation on the remedies available under such a cause of action. Specifically, the Court explained that DOHSA, applicable to deaths on the high seas, explicitly forecloses recovery for nonpecuniary loss such as loss of society. Additionally, while acknowledging that the Jones Act does not explicitly limit damages to any particular form, the Court considered FELA (interpreted early on as providing for only pecuniary damages), which Congress incorporated unaltered into the Jones Act, and concluded that "Congress must have intended to incorporate the pecuniary limitation on damages as well." Id. at 32, 111 S.Ct. at 325. Thus, the Court held that "[t]here is no recovery for loss of society in a Jones Act wrongful death action." Id. Moreover, concerning the plaintiff's cause of action under the general maritime law for unseaworthiness, the Court concluded: "It would be inconsistent with our place in the constitutional scheme were we to sanction more expansive remedies in a judicially created cause of action in which liability is without fault [unseaworthiness claim] than Congress has allowed in cases of death resulting from negligence [Jones Act claim]." Id. at 32-33, 111 S.Ct. at 326. Accordingly, the Court concluded that there is likewise no recovery for loss of society in a general maritime action for the wrongful death of a Jones Act seaman.
In the instant case, Mr. Warren was clearly a Jones Act seaman for purposes of his employment with Sabine Towing. However, that is where the similarity with Miles ends. Mrs. Warren's cause of action for wrongful death damages under the Jones Act or the general maritime law for unseaworthiness was no longer extant after her settlement with Sabine Towing. All that remained after that settlement was a garden-variety wrongful death cause of action under the general maritime law for third-party fault for failure to warn.[5]Miles did not explicitly address the remedies available under such circumstances, nor do we find that it addressed that issue implicitly. Thus, we do not find that Miles precludes the application of state-law wrongful death remedies, including nonpecuniary damages.
Following Miles, the Court handed down Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996), in which the plaintiffs sought to recover wrongful death damages in a general maritime claim from the manufacturer of a jet ski following the death of their twelve-year-old daughter in a jet ski accident. The accident occurred in territorial *537 waters, thus precluding the application of DOHSA, and the issue was whether state-law remedies for wrongful death, i.e., nonpecuniary damages, were available to the plaintiffs. The Court determined that Congress had not prescribed remedies for the wrongful deaths of "nonseafarers" in territorial waters and that state statutes were applicable to deaths within territorial waters. Thus, nonpecuniary damages were available to the plaintiffs in that general maritime case via state law.
As in Yamaha, Mrs. Warren's cause of action for the wrongful death of her husband arose in territorial waters and from the fault of third-party manufacturers. We must determine whether the distinction in the instant case that Mr. Warren was a seaman at the time for purposes of his employment with Sabine Towing is a distinction with any meaning vis-à-vis the third-party manufacturers. The Yamaha Court defined "nonseafarers" as "persons who are neither seamen covered by the Jones Act, 46 U.S.C.App. § 688 (1988 ed.), nor longshore workers covered by the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq." Id. at 205, 116 S.Ct. at 623 n. 2. While Mr. Warren was a seaman covered by the Jones Act vis-à-vis his employer, he was not a seaman covered by the Jones Act vis-à-vis the manufacturer-defendants in this case. The fortuity of the third-party manufacturers' breach of duty occurring in the context of Mr. Warren's seaman employment duties rather than in the context of pleasure-seeking activities should not inure to the benefit of the third-party manufacturers so as to provide them a "safe harbor" to avoid nonpecuniary damages. Thus, under the facts of this case, we find Yamaha allows application of state-law wrongful death remedies, including nonpecuniary damages.
We note that, in her answer to the appeal, Mrs. Warren asserts that she is entitled to an award for loss of household services. "Recovery for loss of household services is an item of special damages, thus requiring proof of an actual pecuniary loss." Myers v. Broussard, 96-1634, p. 23 (La.App. 3 Cir. 5/21/97), 696 So.2d 88, 100. Mrs. Warren presented no evidence of actual pecuniary loss in this regard. Thus, Mrs. Warren is not entitled to recover for loss of household services as an item of special damages. We do note that there is general evidence in the record to support that Mrs. Warren did in fact sustain a loss of household services, although the actual amount of that loss is not in evidence. However, the amount of the general damages award for wrongful death is sufficient to have subsumed that loss. Therefore, we find no error in the trial court's failure to award special damages for loss of household services or in the amount of general damages awarded for wrongful death.

Defendants' Common Assignment of Error Number Six
Additionally, the defendants contend that the trial court erred in awarding excessive survival damages, in awarding medical expenses without accounting for amounts not charged as a result of Medicare provisions, and in awarding judicial interest from the date of judicial demand on the wrongful death and punitive damages awards.
In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the Louisiana Supreme Court explained the standard for appellate review of a trial court's general damages award:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the *538 measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
In the instant case, while on the high side, we do not find that the survival damages award is an abuse of the trial court's vast discretion under the particular facts of this case.
The defendants additionally assert that "[t]he hospital `wrote off' $291,875.54... as required by the Medicare statutes and its contract with Medicare." Thus, they assert that the trial court failed to account for the portion written off when the court awarded medical expenses. In Trueman v. City of Alexandria, 01-1130 (La.App. 3 Cir. 5/15/02), 818 So.2d 1021, we held that the collateral source rule applies to Medicare payments. Thus, we reject this argument.
Finally, the defendants contend that the trial court erred in awarding judicial interest on the punitive damages award from the date of judicial demand rather than from the date of judgment, and they seek clarification that the award of interest for the wrongful death damages runs from the date Mrs. Warren filed the amended petition for wrongful death damages rather than from the date Mr. Warren initially filed his suit for personal injury damages. Because we have reversed the award for punitive damages, we need not address judicial interest in that regard.
The trial court awarded "legal interest from the date of judicial demand" on Mrs. Warren's claim for wrongful death damages. We interpret the interest award to be from the date that Mrs. Warren made demand for that particular item of damages. We note that the rule under general maritime law is that prejudgment interest is awarded from the date of loss rather than the date of demand. Mayo v. Nissan Motor Corp. in U.S.A., 93-852 (La. App. 3 Cir. 6/22/94), 639 So.2d 773, writs granted on other grounds and case remanded, 94-1978, 94-1990 (La.11/11/94), 644 So.2d 661. However, Mrs. Warren has not appealed on that issue, so we are unable to grant her prejudgment interest from the date of loss. Accordingly, we leave the interest award undisturbed.

DISPOSITION
For the foregoing reasons, we reapportion fault as follows: Sabine Towing40%; Chevron, individually and as successor to Gulf20%; Conoco9%; Marathon Oil 0.5%; Dow0.5%; and all other involved companies30.0%. Additionally, we reverse the award of punitive damages. We affirm the judgment below in all other respects and assess 50% of the costs of this appeal to Evelyn Yvonne Warren and 50% percent of the costs of this appeal to the remaining defendants.
REVERSED IN PART; AMENDED IN PART; AFFIRMED IN PART.
NOTES
[1] The original defendants included Sabine Towing; Amerada Hess Corporation; Amoco Oil Company; Ashland Oil, Inc.; Ashland Petroleum Co.; Atlantic Richfield Company; Canadianoxy Offshore Production Co.; Chevron U.S.A., Inc.; Chevron Chemical Company; Coastal Oil Company; Conoco, Inc.; Crown Central Petroleum Corporation; Dow Chemical Company; Marathon Oil Company; Mobil Oil Corporation; Monsanto Company; Murphy Oil USA, Inc.; Phillips Petroleum Company; Shell Oil Company; Tenneco, Inc.; Texaco, Inc.; Texaco Chemical, Inc.; Union Oil Company of California; Sequa Corporation; Fireman's Fund Insurance Company; and American Steamship Owners Mutual Protection & Indemnity Association, Inc.
[2] The trial court assessed each defendant with $500,000.00 in punitive damages, but, because Chevron appeared individually and as successor to Gulf, it was assessed $1,000,000.00.
[3] We are not called upon in this opinion to consider whether benzene is unreasonably dangerous per se. Thus, we make no comment on that issue at this juncture.
[4] The Coast Guard Certificates of Discharge record each date Mr. Warren boarded a Sabine Towing vessel for a trip and the corresponding date when he departed from the vessel. They also identify the port of entry and the port of departure. However, they do not identify any ports of call where cargo may have been loaded or unloaded between the beginning and end of a voyage.
[5] DOHSA was not implicated because the wrongful death cause of action did not arise outside of territorial waters. Mrs. Warren's cause of action was not predicated upon the allegation of benzene being unreasonably dangerous per se but upon the allegation that the manufacturers failed to provide warnings about benzene. While the exposure to benzene continued even after Mr. Warren was on the high seas, the actual breach of duty giving rise to the cause of action at issue occurred in territorial waters at the manufacturers' facilities.